HEROLD LAW, P.A.
Craig S. Provorny, Attorney Id. No. 021601986
25 Independence Boulevard
Warren, New Jersey 07059
(908) 647-1022 (Tel.)
(908) 647-7721 (Fax)
cprovorny@heroldlaw.com
Attorneys for Plaintiff

**Superior Court of New Jersey
Bergen County Chancery Division
FILED:   September 2, 2021**

---

STIFEL TRUST COMPANY, N.A.,
TRUSTEE OF THE ERICK DEVINE
REVOCABLE TRUST,

Plaintiff,

V.

KING PROPERTIES, INC., a corporation,
FISHER ENTERPRISES, INC., a corporation,
and J. DENNIS DEVINE, an individual and as
President of King Properties, Inc. and Fisher
Enterprises, Inc.,

Defendants.

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION
BERGEN COUNTY
GENERAL EQUITY PART
DOCKET NO.   C-208-21

<u>Civil Action</u>

**VERIFIED COMPLAINT**

---

Plaintiff Stifel Trust Company, N.A. in its capacity as Trustee of the Erick Devine

Revocable Trust (the "Plaintiffs"), with their principal place of business at 501 N. Broadway, St.

Louis, Missouri, by way of Verified Complaint against Defendants King Properties, Inc. ("King"),

Fisher Enterprises, Inc. ("Fisher") and Dennis Devine ("Dennis"), say:



## PARTIES

1.      Plaintiff Stifel Trust Company, N.A. is the Trustee of the Erick Devine Revocable Trust, a New Jersey Trust.

2.      King Properties, Inc. is an Oklahoma corporation.

3.      Fisher Enterprises, Inc. is an Oklahoma corporation.

4.      J. Dennis Devine, an individual, has an address of P.O. Box 1147, Heber Springs, Arkansas 72543 and is the President of both King and Fisher.

## STATEMENT OF FACTS

5.      Erick Devine (the "Decedent") established the Erick Devine Revocable Trust (the "Trust") on August 16, 1995, and most recently restated same on March 22, 2018. A true and correct copy of the Trust is attached hereto as **Exhibit A**.

6.      The Decedent died a resident of Woodcliff Lake Borough, New Jersey on April 18, 2019. A true and correct copy of the Decedent's Certificate of Death is attached hereto as **Exhibit B**.

7.      At the time of the Decedent's death, the Trust owned 333.33 shares of closely-held common stock in each of two corporations, King and Fisher.

8.      Pursuant to Paragraph 1 of the Stock Purchase Agreement for King ("King Stock Purchase Agreement"), upon the death of a shareholder, King would have the right to purchase back the shares owned by the deceased shareholder. A copy of the King Stock Purchase Agreement is attached hereto as **Exhibit C**.

9.      Similarly, pursuant to Paragraph 1 of the Stock Purchase Agreement for Fisher ("Fisher Stock Purchase Agreement"), upon the death of a shareholder, Fisher would have the right

to purchase back the shares owned by the deceased shareholder. A copy of the Fisher Stock Purchase Agreement is attached hereto as **Exhibit D**.

10. Both the King Stock Purchase Agreement and the Fisher Stock Purchase Agreement provided that the price of the companies' respective shares would be their fair market values on their valuation dates.

11. Fair Market Value was defined in the Stock Purchase Agreements as "an amount which bears the same proportion to the Net Worth . . . of the Corporation as the number of Shares to be purchased to the total number of the Corporation's Shares outstanding on the Valuation Date."

12. For the purposes of a purchase taking place upon the death of a shareholder, the Valuation Date was defined in the Stock Purchase Agreements as "the last day of the month preceding the month in which the death of the deceased shareholder occurred."

13. By way of letter dated October 8, 2019 from Defendant J. Dennis Devine to Nicholas Forte, Trust Officer for Plaintiff Stifel Trust Company Trustee, acting on behalf of both King and Fisher, Dennis stated "[o]n behalf of both corporations, I exercised the right of the corporations to redeem Erick's stock according to Exhibit B of the agreement.

14. In exercising the rights of the corporations Dennis had performed a valuation of the shares of King and Fisher owned by the Trust at the time of the Decedent's death as of March 31, 2019. Attached hereto as **Exhibit E** is a true and correct copy of the Certification of J. Dennis Devine previously submitted to the Court in litigation captioned <u>Stifel Trust Company, N.A., et al.</u> <u>v. The Actors Fund of America, et al.</u>, Superior Court of New Jersey, Chancery Division, Probate Part, Bergen County, Docket No. C-152-20 (the "Prior Litigation").

15.     The purpose of the Prior Litigation was to approve the fair market value of the King and Fisher stocks as had been calculated by Dennis.

16.     In performing his calculations of the fair market value Dennis determined the value of Fisher was negative.

17.      He determined, however, that if the total stockholder's equity was substituted for the valuation formula in the Fisher Stock Purchase Agreement, the Decedent's share of Fisher would equal $4,285.23.

18.     Dennis's calculations determined, based on the valuation formula in the King Stock Purchase Agreement, the Decedent's share of King would equal $208,314.70.

19.     Following the determination by Dennis of the Fair Market Value, Plaintiff filed a Verified Complaint with the Court in the Prior Litigation to approve the fair market value of both Fisher and King.  Attached hereto as **Exhibit F** if a true and correct copy of the Verified Complaint.

20.     In doing so Dennis submitted the aforementioned Certification attesting to the offer of both Fisher and King to purchase the shares of Decedent and to the fair market value as calculated by Dennis, being $4,285.23 for Fisher and $208,314.70 for King.

21.     On September 24, 2020, the Court approved both the purchase price of the stock and the price for which the stock would be purchased, in accordance with the Certification of Dennis.  Attached hereto as **Exhibit G** is a true and correct copy of the Order.

22.     Following the entry of the Order, however, Dennis, on behalf of both Fisher and King, has failed to close on the purchase the stock of as required to do so according to the terms of the Fisher and King Stock Purchase Agreements.

23.     With respect to Fisher, while in his most recent communication Dennis agreed to pay the full purchase price, the Fisher Stock Purchase Agreement requires closing to occur no later

than sixty (60) days following Fisher's exercise of the option to purchase the shares, with the option having been exercised on October 8, 2019.

24.      Despite sixty (60) days having long past both the exercise of the option by Fisher and the Court's approval of the purchase price Fisher has failed to close on the purchase of Decedent's shares of stock in Fisher.

25.      With respect to King, while Dennis has agreed to pay the full $208,314.70 for the stock, he refuses to make payment in accordance with the terms of the King Stock Purchase Agreement.

26.      Section 7 of the King Stock Purchase Agreement states in part as follows:

**7. PAYMENT OF THE PURCHASE PRICE.**

7(a) DOWN PAYMENT. **The purchase price of Shares shall be paid in cash except that at the option of the purchasing party or parties, 80% of the purchase price may be deferred and 20% paid at closing.**

7(b) PROMISSORY NOTE. The deferred portion of the price shall be evidenced by the promissory note of each purchasing party made payable to the order of the selling party.  The note of a purchasing party shall be in substantially the form of that set forth in Exhibit C.  The interest rate for such installment promissory note shall be equal to the interest rate determined in accordance with Internal Revenue Code Section 7872 as of the date of the closing as specified in paragraph 8.

7(c) CORPORATION AS OBLIGOR. If the maker of the note is the Corporation, the note shall be unsecured but the note shall be guaranteed by each surviving or remaining shareholder in substantially the form of that attached as Exhibit C-1, and all shares owned by each such surviving or remaining shareholder, excepting those required to be pledged as provided in paragraph 7(d), shall be pledged by him to the payee of the note to secure the payment of the guarantee.  (emphasis added).

27.      As set forth in the King Stock Purchase Agreement, if the purchase price is paid out over time, the first payment must be twenty (20%) percent of the purchase price, with the remaining eighty (80%) percent paid out in equal installments over ten (10) years.

28.     Instead of paying twenty (20%) percent of the purchase price for the first payment, however, Dennis, on behalf of King, is refusing to pay twenty (20%) percent for the first payment.

29.     Rather, Dennis, on behalf of King, is proposing to pay off the purchase price, with interest, with monthly payments of $1,950.55 over period of ten (10) years.

30.     Moreover, as set forth above, given that King is the purchaser of the shares, Dennis is required to sign a guarantee of the payments of the purchase price in his individual capacity in the form attached to the King Stock Purchase Agreement as Exhibit C-1.

31.     Dennis, however, as the sole surviving shareholder, has refused to sign the guarantee.

32.     Moreover, pursuant to Section 8 of the King Stock Purchase Agreement the closing on the purchase was to occur within sixty (60) days of the death of Erick Devine or within sixty (60) days of the date of the exercise of the option.

33.     The options to purchase were exercised by both Fisher and King on October 8, 2019.

34.     Neither Fisher nor King have closed on the purchase of the shares since the Court's approval of the purchase price.

35.     Fisher is in breach of the Fisher Stock Purchase Agreement.

36.     King is in breach of the King Stock Purchase Agreement.

37.     Dennis is in breach of the King Stock Purchase Agreement due to his refusal to sign the guarantee required by the King Stock Purchase Agreement.

## FIRST COUNT
## BREACH OF CONTRACT (FISHER)

38.     Plaintiff repeats and realleges the prior paragraphs of the Verified Complaint as if fully set forth herein.

39.     Fisher validly exercised the option to purchase the shares of Decedent.

40.     Fisher, however, is in breach of the Fisher Stock Purchase Agreement in its refusal to close on the purchase of Decedent's shares of stock in Fisher.

**WHEREFORE**, Plaintiff seeks an Order against Fisher:

1.      Entering Judgment mandating Fisher to purchase Decedent's shares of stock in Fisher within ten (10) days of entry of the Order;

2.      Such other relief as the Court deems just and proper, including, but not limited to, attorney's fees and costs of suit.

<u>**SECOND COUNT**</u>
<u>**BREACH OF CONTRACT (KING AND DEVINE)**</u>

41.     Plaintiff repeats and realleges the prior paragraphs of the Verified Complaint as if fully set forth herein.

42.     King validly exercised the option to purchase the shares of Decedent.

43.     Pursuant to the King Stock Purchase Agreement King can either pay the full purchase price at closing or pay twenty (20%) percent of the purchase price at closing with the remaining eighty (80%) percent paid in monthly installments over a period of ten (10) years in accordance with the terms of the King Stock Purchase Agreement.

44.     King, however, is in breach of the King Stock Purchase Agreement in its refusal to pay twenty (20%) percent of the purchase price of the shares at closing.

45.     Additionally, given the option to purchase the shares of Decedent was exercised by King, Dennis is required to sign a personal guarantee for the purchase of the shares if the purchase price is being paid out over ten (10) years.

46.     Dennis, however, is in breach of the King Stock Purchase Agreement in his refusal to sign a guarantee of the purchase price in accordance with the terms of the King Stock Purchase Agreement.

WHEREFORE, Plaintiff seeks an Order against King and Dennis:

1.     Entering Judgment mandating King to purchase Decedent's shares of stock in King at the fair market value as previously approved by the Court, to pay twenty (20%) percent of the purchase price at closing and to do so within ten (10) days of entry of the Order;

2.     Entering Judgment against Dennis mandating Dennis to sign the personal guarantee in the form attached to the King Stock Purchase Agreement and to do so within ten (10) days of entry of the Order;

3.     Such other relief as the Court deems just and proper, including, but not limited to, attorney's fees and costs of suit.

## THIRD COUNT
## DISTIBUTION OF SHARES IN KING AND FISHER

47.     Plaintiff repeats and realleges the prior paragraphs of the Verified Complaint as if fully set forth herein.

48.     The continuation of paying trustee commissions to Plaintiff and incurring other trust administrative costs indefinitely would be inequitable to the Trust beneficiaries once the Trust's liquid assets have been distributed and the only assets remaining in the Trust are the shares of stock in King and Fisher.

WHEREFORE, Plaintiff seeks an Order in the alternative to the relief requested in the First and Second Counts in the event the Court does not enter the relief requested:

1.     Entering Judgment approving distribution of the shares of King held in the Trust to the beneficiaries of the Trust;

2.      Entering Judgment approving the distribution of the shares of Fisher held in the Trust to the beneficiaries of the Trust;

3.      Such other relief as the Court deems just and proper, including, but not limited to, attorney's fees and costs of suit.

## FOURTH COUNT
## FAILURE TO COMPLY WITH CORPORATE FORMALITIES (KING AND FISHER)

49.      Plaintiff repeats and realleges the prior paragraphs of the Verified Complaint as if fully set forth herein.

50.      At the time of his death Decedent was a fifty (50%) percent shareholder of both King and Fisher.

51.      As a result, Plaintiff is a fifty (50%) percent shareholder of both King and Fisher.

52.      Following Decedent's death both King and Fisher have failed to follow corporate formalities.

53.      Following Decedent's death there has not been a shareholders' meeting either for King nor Fisher.

54.      Pursuant to 18 OK Stat § 1056 annual meetings of shareholder are required to be held for the purpose of electing directors.

55.      By failing to conduct an annual shareholders' meeting following the death of Decedent both King and Fisher are in violation of 18 OK Stat § 1056.

56.      Despite requests from counsel for Plaintiff, neither King nor Fisher has provided copies of the certificates of incorporation or bylaws.

57.      Despite requests from counsel for Plaintiff, neither King nor Fisher has provided Plaintiff access to the books and records of either King or Fisher.

58.     Pursuant to 18 OK. Stat § 18-1065 a corporation is required to produce for inspection and copying the books and records requested by a shareholder, or counsel for the shareholder.

59.     Pursuant to 18 OK Stat § 18-1065 the corporation is obligated to respond to the request within five (5) business days of the request.

60.     Neither King nor Fisher has responded to requests from counsel for Plaintiff for access to the books and records of either King or Fisher.

61.     By failing to respond to the requests King and Fisher are in violation of 18 § OK Stat 1065.

**WHEREFORE**, Plaintiff seeks an Order from the Court against King and Fisher:

1.     Entering Judgment mandating King and Fisher to conduct annual shareholder meetings, and to conduct the next shareholder meetings within thirty (30) days of the date of this Order;

2.     Entering Judgment mandating King and Fisher to provide Plaintiff or Plaintiff's counsel access to the books and records of King and Fisher within ten (10) days of the date of this Order; and

3.       Such other relief as the Court deems just and proper, including, but not limited to, attorney's fees and costs of suit.

HEROLD LAW, P.A.
Attorneys for Plaintiff

By: /s/ Craig S. Provorny
Craig S. Provorny, Esq.

DATED:  September 1, 2020

## DESIGNATION OF TRIAL COUNSEL

In accordance with R. 4:25-4, Craig S. Provorny, Esq. is hereby designated as trial counsel for the within matter.

HEROLD LAW, P.A.
Attorneys for Plaintiffs

By: /s/ Craig S. Provorny
Craig S. Provorny, Esq.

DATED:  September 1, 2020

## <u>CERTIFICATION PURSUANT TO R. 4:5-1</u>

The undersigned hereby certifies that the matter in controversy is not the subject of any other action pending in any court and is likewise not the subject of any pending arbitration proceeding. The undersigned further certifies that he has no knowledge of any contemplated action or arbitration proceeding which is contemplated regarding the subject matter of this action. The undersigned further certifies that he is not aware of any other parties who should be joined in this action.

HEROLD LAW, P.A.
Attorneys for Plaintiffs

By: <u>/s/ Craig S. Provorny</u>
Craig S. Provorny, Esq.

DATED: September 1, 2020

## VERIFICATION

I, Kurt Longworth, on behalf of Stifel Trust Company, N.A. in its capacities of Executor of the Estate of Erick Devine and Trustee of the Erick Devine Revocable Trust, verify that I have read the within Verified Complaint and verify that all facts contained therein are true to the best of my knowledge, information and belief and as to matters stated to be upon information and belief, have information to believe that same are true and accurate. Furthermore, I verify that the documents attached to the Verified Complaint as Exhibits are true and correct copies. I am aware if any of the foregoing statements made by me are willfully false I would be subject to punishment.

Stifel Trust Company, N.A.
Kurt Longworth, President

DATED: 8·13·21

- 13 -

# EXHIBIT A

# THE ERICK DEVINE REVOCABLE TRUST

This is a restated revocable Trust Agreement, dated March 22, 2018,

BETWEEN    Erick Devine, of Woodcliff Lake, New Jersey (referred to in the first person),

AND    Erick Devine, of Woodcliff Lake, New Jersey (referred to as "my trustee").

I have no spouse and no children.

I have previously established a revocable trust by Trust Agreement dated August 16, 1995, in order to provide for myself and to dispose of my assets in the event of my death, which trust is known as "The Erick Devine Revocable Trust," which was previously amended from time to time, most recently by restating it in its entirety by Trust Agreement dated October 28, 2013. Under the terms of that Trust Agreement I reserved the right to amend any of the trust's provisions in my sole discretion. I now desire to amend that Trust Agreement by restating it in its entirety, and my trustee hereby agrees to continue to administer the trust in accordance with the terms of this restated Trust Agreement. My trustee and I therefore agree as follows:

My trustee acknowledges the retention of the property accumulated to date under the trust, for which my trustee has satisfactorily accounted to me through this date. This property, together with any other property which anyone may transfer to my trustee, shall be the trust fund and shall be invested and distributed by my trustee in accordance with the provisions of this Trust Agreement.

This Trust Agreement is organized into the following Articles:

| | |
|---|---|
| ONE | OPERATION DURING GRANTOR'S LIFE |
| TWO | DISPOSITION UPON GRANTOR'S DEATH |
| THREE | FIDUCIARY APPOINTMENTS |
| FOUR | TRUSTEE POWERS |
| FIVE | PAYMENT OF TAXES |
| SIX | GENERAL PROVISIONS |

## ARTICLE ONE: OPERATION DURING GRANTOR'S LIFE:

(a)    During my lifetime my trustee shall distribute such amounts of the net income and principal of the trust as I may from time to time direct. In the absence of any such direction, my trustee shall distribute to me or for my benefit such amounts of net income and principal as my trustee from time to time determines in its discretion to be necessary or desirable for my benefit, including but not limited to the following:

(i)    To maintain me comfortably in my accustomed manner of living;

(ii)    To pay all expenses for my medical, nursing, hospital, and custodial care;

(iii)    To pay all income, transfer, excise, property, and other taxes which may be assessed against me or any of my property;

(iv)    To employ servants, companions, and other agents and employees for me;

- 1 -

(v)    To maintain in good repair my residences and any related improvements, and to purchase and repair all household equipment and other tangible personal property associated with the residences;

(vi)    To maintain all real property directly or indirectly owned by me, in whole or in part, wherever located, and to pay all carrying charges and the costs of appropriate repairs and improvements with respect to such property;

(vii)    To pay premiums on any kind of insurance relating to my person and property;

(viii)    To pay my travel expenses;

(ix)    To make gifts to charitable organizations on my behalf which are consistent with my past practices and in keeping with my intent that my needs shall have first priority;

(x)    To make payments of every nature on my behalf which I could have made had I retained the assets transferred to the trust.

(b)    My continued exercise of my powers as trustee or co-trustee during my life shall be subject to the following:

(i)    If the individuals designated in paragraph (ii) certify in writing that I, because of any physical or mental disability, cannot or should not continue to serve as a trustee, my powers as such shall be suspended, and my co-trustee(s), if any, or else the designated successor trustee(s), shall thereafter exercise all such powers without my consent. No trustee acting while my powers have been suspended shall be liable for relying upon the designated individuals' certification, and the trustee shall be under no duty to make any investigation with respect to the certification.

(ii)    A certification as to my inability to continue as trustee must be signed by two physicians, one of whom shall be my personal physician, if I have one. In making any such determination, such individuals shall consider whether my mental or physical condition is impaired to such an extent that it would be unwise, imprudent, or unfeasible for me to participate in the management of my business and financial affairs. I do not intend that such condition of disability must amount to legal incompetency. In connection with obtaining such certification this shall constitute a direct authorization and consent under the Federal law known as the Health Insurance Portability and Accountability Act of 1996, as amended, and the regulations thereunder ("HIPAA") for my health care providers to disclose individually-identifiable health information to my trustee and the individuals or entities identified in this sub-paragraph.

(c)    My trustee shall not be subject to the direction of any attorney-in-fact I have authorized to act on my behalf.

- 2 -

## ARTICLE TWO: DISPOSITION OF TRUST ON GRANTOR'S DEATH:

(a)    <u>Payments to Estate</u>    Following my death, my trustee shall pay to my executor or upon my executor's order such amounts as my executor shall certify to my trustee as being required to pay my debts, funeral expenses, estate administration expenses, and specific bequests under my will. Further, my trustee shall contribute to my executor (or pay directly to any taxing authority) such amounts as my executor shall certify as being required to pay taxes imposed by reason of my death, including any interest and penalties, subject to the provisions of the PAYMENT OF TAXES ARTICLE.

(b)    <u>Remaining Trust Fund</u>   The remaining trust fund shall be distributed as follows:

(i)    The sum of Five Thousand Dollars ($5,000) shall be distributed to each of the following individuals who survives me:

    1.    My nephew, James Gregory Devine;

    2.    My nephew, Richard Scott Devine;

    3.    My niece, Lindsay Devine Hope, currently residing in Coldwater Mississippi; and

    4.    My grandnephew, Griffin McCoy Lawrence, currently residing at 1500 Mc Natt Dr. #5; Brookland, Arkansas 72417.

(ii)    The remaining balance of the trust shall be divided into two (2) equal shares.

    1.    One such share shall be divided into four (4) equal sub-shares with each of the following organizations receiving one of such sub-shares:

        A.    The Actors' Fund of America, 729 Seventh Ave., 10th Floor, New York, NY 10036.

        B.    The Point Foundation, 5757 Wilshire Blvd., Suite 370, Los Angeles, CA 90036, Federal tax ID 84-1582086.

        C.    Wayne State University Department of Theatre, Old Main #3225, 4841 Cass Ave., Detroit, MI 48202, to be used for the graduate program in theatre at the discretion of presiding chairman of that program.

        D.    The Sandy Fund, c/o The Humane Society of New York, 306 E. 59th Street, New York, New York 10022.

    2.    The second such share shall be divided equally among the following individuals who survive me:

        A.    Michael Collins, 145 Hicks St., Brooklyn, NY 11201, but if Michael Collins predeceases me, his share shall be cancelled and divided equally among the individuals in this (b)(ii)(2) of this Article TWO who survive me.

B.   Jeffrey Davault, 118 S. Berry Rd., Norman, OK 73068, but if Jeffrey Davault predeceases me, his share shall be cancelled and divided equally among the individuals in this (b)(ii)(2) of this Article TWO who survive me.

C.   Vern Stefanic, 6718 S. 71st E. Ave., Tulsa, OK 74133, but if Vern Stefanic predeceases me, his share shall be cancelled and divided equally among the individuals in this (b)(ii)(2) of this Article TWO who survive me.

D.   James Young, 24 McCathern Road, Lebanon, NJ 08833, but if James Young predeceases me, his share shall be cancelled and divided equally among the individuals in this (b)(ii)(2) of this Article TWO who survive me.

E.   James Williston, 168 West Elm Avenue, Quincy, MA 02172, but if James Williston predeceases me, his share shall be cancelled and divided equally among the individuals in this (b)(ii)(2) of this Article TWO who survive me.

F.   Patty Metz, 150 Burr Place, Hasbrouck Heights, NJ 07604; cell: 201-838-7961, but if Patty Metz predeceases me, her share shall be cancelled and divided equally among the individuals in this (b)(ii)(2) of this Article TWO who survive me.

G.   Wendy Lynn Williams, 405 Franklin Turnpike, #23, Mahwah, NJ 67430, permanent address: 107 Nowell St. East, New York Mills, MN, 56567, but if Wendy Lynn Williams predeceases me, her share shall be cancelled and divided equally among the individuals in this (b)(ii)(2) of this Article TWO who survive me.

H.   Sean Rosenzweig, 7238 Cenrose Circle, Westwood, NJ 07675; cell: 201-895-1465, but if Sean Rosenzweig predeceases me, his share shall be cancelled and divided equally among the individuals in this (b)(ii)(2) of this Article TWO who survive me.

3.   If all of the individuals named in (b)(ii)(2) of this Article TWO predecease me, the entire share described in (b)(ii)(2) of this Article TWO shall be added to the charitable gifts described in (b)(ii)(1) of this Article TWO.

## ARTICLE THREE: FIDUCIARY APPOINTMENTS:

(a)     If I cease to serve as trustee during my life for any reason, and upon my death, I appoint Stifel Trust Company, N.A. (or its corporate successors).

(b)     Whenever a trust has only one or more individuals serving as trustee or co-trustees, the trustee(s), may by a written instrument appoint another individual or a corporate fiduciary as a

- 4 -

co-trustee of that trust. Further, the last individual or individuals designated herein and serving as trustee or co-trustees of any trust may by a written instrument appoint one or more individuals or corporate fiduciaries as successor trustees of that trust, to serve concurrently or consecutively.

(c)     Any trustee may, without anyone's consent, resign his office by delivering his written resignation to all beneficiaries currently eligible for distributions from the trust (or to the legal representative or guardian of any minor or incompetent beneficiary), and to his co-trustee, or if he is the sole trustee, to his successor trustee, and by transferring to such trustee all of the trust property in his control. If there is no co-trustee, no successor trustee is then provided for under this Agreement, and the beneficiaries fail to petition an appropriate court for the appointment of a successor within 30 days after receiving the trustee's notice of resignation (and a successor trustee is not otherwise appointed pursuant to terms of this Trust Agreement), the trustee may appoint an interim successor trustee to serve until a permanent successor has been appointed. All fees and expenses (including reasonable attorney's fees) attributable to the appointment of a successor trustee shall be paid by the trust. Further, any trustee may, without anyone's consent, renounce any power given to him if he determines that such renunciation would further the purposes of the trust.

(d)     Any successor trustee shall be indemnified and held harmless by the trust from any claims, losses, liabilities, and expenses arising from any act or omission of a predecessor trustee, and no successor trustee shall have any obligation to audit or review the actions or accounts of its predecessor.

(e)     No trustee shall be required to provide any bond or other security for the faithful performance of his duties, including any bond that would otherwise be required for the return of commissions paid to a trustee. If any jurisdiction nevertheless requires a bond, no surety shall be required.

(f)     Any corporate fiduciary selected as successor trustee under this Article shall be a trust company or bank organized under the laws of the United States or one of the States which possesses trust powers.

ARTICLE FOUR: TRUSTEE POWERS: Except as otherwise expressly required under this Trust Agreement, the following powers are given to the trustee, in addition to and not by way of limitation of the powers vested by law, all of which may be exercised without authorization by any court:

(a)     to hold and invest the trust's assets in such checking and savings accounts, money market funds, common and preferred stocks, investment trust shares, cash management accounts, mutual funds, collective and common trust funds, interests in partnerships, limited liability companies, and similar vehicles, bonds, notes, other evidences of indebtedness, improved and unimproved real property, tangible and intangible personal property, and other investments as my trustee deems appropriate, including collective and common trust funds maintained by my trustee and mutual funds offered, managed, or distributed by an owner, subsidiary, or affiliate of my trustee (hereinafter an "affiliate"), regardless of nondiversification and regardless of whether any such investment is authorized by law regarding the investment of trust funds, or is of a wasting asset nature, or is temporarily nonincome producing, provided that in such matters my trustee shall seek

- 5 -

to maximize the real total return (income plus realized and unrealized gains, minus inflation) on such assets as a whole, consistent with the levels of risk, volatility, and liquidity my trustee deems appropriate in view of the trust's beneficiaries and its purposes;

(b)     to buy, sell, or exchange any investment, including any real property and an interest in any trust, for cash or on credit, from, to, or with any person (including my trustee, an affiliate of my trustee, my estate, the trustee of any trust created by me during my life, any such trust, and any beneficiary of my estate or any such trust) upon such terms as my trustee deems advisable;

(c)     to hold any investment in the name of my trustee, or in the name of a nominee or the nominee of an affiliate, or in such other form that title may pass by delivery, and to hold, maintain, or manage any asset in any jurisdiction;

(d)     to purchase options to buy or sell any asset, and to sell options permitting the purchasers to buy assets owned by the trust (i.e., excluding "naked calls"), which options may extend beyond the termination of the trust;

(e)     to exercise any options or rights to purchase property, including stock or other securities, or any options or rights to receive money in lieu of property, whether received as a result of my employment or otherwise;

(f)     to exercise in person or by general or limited proxy all voting and other rights, powers, and privileges and to take all steps to realize all benefits with respect to stocks or other securities;

(g)     to exercise any election or option provided by the Code and any other federal or state statute or regulation governing the taxation, valuation, or administration of the trust or any beneficiary's interest in the trust;

(h)     to borrow from anyone (including myself or my trustee) any money required for any purpose, and to secure any loan with any asset of the trust;

(i)     to buy, sell, exchange, maintain, manage, and operate any form of real property, and to lease any property for a term which may extend beyond the termination of the trust;

(j)     to employ and compensate as an expense of the trust, without any reduction in my trustee's compensation, such attorneys. accountants, agents, custodians, brokers, experts, investment counsel, and other advisors as my trustee may deem appropriate, including any person who also serves as my trustee or any affiliate of my trustee; and any such person may be engaged to manage or advise on the investments of the trust on a discretionary or nondiscretionary basis, to act as a broker or dealer to execute transactions, including the purchase of any securities distributed, underwritten, or issued by an affiliate at standard commission rates, markups, or concessions, and generally to exercise such of the trustee's discretionary and nondiscretionary powers as the trustee determines to delegate to such person;

(k)     to pay for the preparation of periodic accountings as an expense of the trust;

(l)     to carry insurance against such risks and upon such terms as my trustee deems advisable;

(m)   to make partial or total distributions in cash or in kind (including real and personal property, and undivided interests therein), valuing property distributed in kind at its fair market value when distributed, but without being required to make pro-rata distributions of specific property;

(n)   to permit the beneficiary of any trust to enjoy the assets held by the trust without rent or other compensation to the trust, such as by occupying the trust's real property or using its tangible property;

(o)   to settle all claims held by or against the trust without the consent of any beneficiary;

(p)   to make loans to any person, including a beneficiary of the trust, upon such terms as my trustee deems proper;

(q)   to organize corporations, partnerships, limited liability companies, or other entities to hold, manage, or liquidate any trust property, and to contribute assets from any trust to such an entity organized by others;

(r)   to retain any business interest transferred to or acquired by my trustee for any period of time; to participate in the conduct of such business or to retain others to do so; to approve compensation to any persons responsible for the conduct of such business, including my trustee and any beneficiaries of the trust; to invest other assets in such business upon such terms as my trustee deems prudent; to sell all or a portion of such business interest, or to transfer or exchange such interest as part of a merger or reorganization; and in general to take, or delegate to others discretionary power to take, any action with respect to the management of such business which an individual could take as outright owner of such business or interest, without regard to any other interest in such business which may be held by my trustee for its own benefit or for the benefit of others, or which may be held by any beneficiary of the trust;

(s)   to divide a single trust into two or more trusts for tax, investment, administrative, or other reasons, and where two or more trusts created by me either inter vivos or by will (the "original trusts"), are subject to similar terms and are for the benefit of the same people, to join the original trusts and administer them as a single trust ("surviving trust"), provided that any such surviving trust shall not extend the time for vesting of any estate or beneficial interest in the trust, or suspend the absolute ownership or power of alienation of the trust's property beyond the period applicable to the original trust with the earliest of such date;

(t)   to purchase or retain as an investment life insurance or annuity policies on my life or on the life of any beneficiary of the trust, including policies purchased through or from an affiliate (whether as agent or issuer), to pay the premiums on any policy with trust assets (but my trustee shall not be liable for any lapse or other loss caused by the insufficiency of the trust's assets to maintain any policy), and to exercise all rights and elections available under any policy, including but not limited to the rights to designate the beneficiary of any policy, to direct the investment of any policy values among separate accounts offered by the insurer (including accounts managed by an affiliate), to borrow or make withdrawals from any policy for any purpose, to pledge any policy as security for a loan, to exchange any policy for another policy (whether similar or different), to convert any policy into a different form of insurance, to sell or distribute any policy to any

- 7 -

beneficiary, to surrender any policy and receive its cash value, to allow any policy to lapse, to elect among settlement options, to collect any death or living proceeds, dividends, or other payments due or available to the trust as beneficiary, and to undertake whatever legal action may be necessary to such collection, provided my trustee's expenses in connection with such action have been provided for to its satisfaction, and provided further, that no trustee other than myself shall have any of the foregoing powers as to any policy insuring his own life;

(u)     except as required under the following two (2) paragraphs, whenever there are more than two trustees, to exercise and perform every power (including discretionary powers), authority, or duty by majority vote with the same effect as with unanimous approval;

(v)     to authorize by unanimous vote of all trustees any one or more of them to perform any administrative or ministerial acts in furtherance of any decision, policy, or practice adopted by the trustees, including but not limited to signing checks, giving receipts, effecting distributions, making deposits and withdrawals from the trust's accounts, accessing the trust's safe deposit boxes, effecting the purchase or sale of trust assets and the disposition of the property purchased or the sales proceeds, filing tax returns, and dealing with tax authorities and other governmental agencies;

(w)     to agree by unanimous vote of all trustees upon an allocation of investment responsibilities, which may include an agreement that one trustee shall have sole responsibility for and authority over the purchase, retention, and sale of individual securities, mutual funds, and other assets in furtherance of an investment policy adopted by the trustees, and may include an agreement that one or more trustees shall have sole responsibility for and authority over other assets (such as real or tangible personal property, business interests, or insurance contracts);

(x)     to access, use and take control of digital devices that comprise a portion of the trust, including, but not limited to iPads and other tablets, desktop and laptop computers, flash drives, peripherals, storage devices, mobile telephones, smart phones and any other similar devices;

(y)     to access, modify, delete, control, transfer and otherwise deal with digital assets which comprise a part of the trust, including, but not limited to bank accounts, brokerage accounts, credit union accounts, bill paying accounts, on line award of miles, points and other benefits arising from or attributable to using credit or debit cards, emails, documents, images, audio and video files, software licenses, domain registrations, websites, email addresses, social network accounts, social media accounts, file sharing accounts, financial management accounts, domain registration accounts, domain name service accounts, web hosting accounts, tax preparation service accounts, online stores, affiliate accounts and other programs;

(z)     to access, change and delete user names, domain names, passwords, "secret questions and answers", account numbers and other means of accessing or preventing the access to digital assets;

(aa)     to download, upload, delete, replace, modify and otherwise deal with programs, software, "apps", "widgets", and other similar items commonly, but not exclusively used in connection with mobile phones, tablets, and other digital devices;

(bb)     to secure and protect digital assets and information on both digital and non digital devices, including, but not limited to the use and creation of encryption and firewalls;

- 8 -

(cc)    to decrypt all encrypted electronically stored information; to bypass, reset or recover any password or any other kind of authentication information, and to retain all consultants, agents and experts in doing any of the foregoing; and

(dd)    generally, with respect to all assets, to exercise the same rights as may be exercised by persons owning such assets individually; provided, however, that such rights and powers shall be exercised prudently, in good faith, and with reasonable discretion as required by law.

ARTICLE FIVE: PAYMENT OF TAXES:

(a)    If the trust fund is liable (whether by operation of law or by reason of a request for contribution by my executor) for any estate, inheritance, generation-skipping transfer, and like taxes imposed by reason of my death with respect to any property, whether or not disposed of by this Trust Agreement, or any interest or penalty relating thereto (all such taxes, interest, and penalties referred to collectively in this Article as "Taxes"), my trustee shall pay the Taxes as soon after my death as is practicable, subject to the following provisions.

(b)    Any Taxes, whether federal or state estate tax due from my estate and any New Jersey Transfer Inheritance tax or similar tax chargeable as a result of the cash gifts to my nieces and nephews shall be paid from the trust fund without apportionment or allocation. I realize that this directive will require the charitable gifts I have made to bear a portion of any such Taxes. Any New Jersey Transfer Inheritance Tax or similar tax (other than those Taxes resulting from to the cash gifts made to my nieces and nephews), including, but not limited to taxes assessed on property passing under my will or in any other manner as a result of my death, shall be allocated to and paid by the beneficiary of the transfer from which such Taxes arise.

(c)    My trustee shall not make any payment for Taxes or any other claims out of (i) any assets of the trust fund which would not (absent such payment) be included in my gross estate for federal estate tax purposes, or (ii) the proceeds of any insurance on my life or other assets which would not (absent such payment) be subject to state estate or inheritance taxes, unless all other assets of the trust have been exhausted.

(d)    Any federal generation-skipping transfer tax resulting from a transfer occurring under this Trust Agreement shall be charged to the property constituting the transfer in the manner provided by the Code.

ARTICLE SIX:   GENERAL PROVISIONS:   The following general provisions shall apply:

(a)    This Trust Agreement, the trust initially created under it, and any trust subsequently created under it, shall have its situs in the State of New Jersey, or any other state of the United States affirmatively designated by my trustee in writing. Each trust created under this Trust Agreement shall be interpreted and administered under the laws of the state of its situs, unless a trust owns real property in another state that requires its laws to govern with respect to such property, in which event the laws of that other state shall apply to the extent required. The trustee may, without the approval of any court, change the situs, the governing law, or both, of any trust to

- 9 -

any other state of the United States, and may move the assets of any trust from one jurisdiction to another, provided that such change does not alter any beneficiary's interest in the trust.

(b)    The term "descendant" shall include only lawful descendants, including any legally adopted individual and his descendants.

(c)    In determining survivorship, any individual who dies before the 31st day after my death shall be deemed to have predeceased me, unless this survivorship requirement would cause a taxable generation-skipping transfer as defined in the Code.

(d)    I reserve the right at any time during my life to amend this Trust Agreement in any respect, and to revoke it entirely.  Notwithstanding the foregoing, following my death, my trustee shall have the power, without the approval of any court, to amend the Trust Agreement in any manner it may deem necessary or appropriate to facilitate trust administration, or to carry out my intentions despite changes in applicable laws, provided such amendment has been approved in writing by a majority of the adult beneficiaries who may be affected, and provided further that a trustee who is one of such beneficiaries may not participate in the proposal to make such an amendment.

(e)    Any use of the singular shall include the plural and the plural the singular.  Any use of the masculine, feminine, or neuter shall be interpreted as the context requires.

(f)    Any reference to the "Code" shall mean the Internal Revenue Code of 1986, as amended.

(g)    I direct that, in any proceeding relating to a trust, service upon any individual under a disability shall not be made when another individual not under a disability is a party to the proceeding and has the same interest as the individual under the disability.  For purposes of this paragraph, the term "disability" shall be defined as a condition which renders such person unable to comprehend and respond to documents served upon him or her.

(h)    My trustee is authorized to receive at any time any additions to the trust fund which are acceptable to my trustee, and such additions shall thereafter be administered and distributed in accordance with this Trust Agreement.  My trustee is specifically authorized to accept any compensation, benefits, shares of profits, awards, settlements, rents, interest, dividends, proceeds from sales or exchanges, and other amounts which I have earned or to which I may become entitled, to the extent I, or my attorney-in-fact, have directed such amounts to be paid to this trust.  My trustee is not required to accept assets from sources other than myself if in my trustee's absolute discretion the tendered assets would not be suitable trust property.  Specifically, other than a transfer to my trustee by me, my trustee shall not be deemed to have accepted title to, and shall not act or be obligated to act in any way as a fiduciary with respect to, any real property (including any such property owned or operated by a proprietorship, partnership, limited liability company, corporation, or other enterprise) until (i) an appropriate environmental audit has been performed at the trust's expense to confirm that conditions at such property or the operations conducted by any enterprise at such property comply with all applicable environmental laws and regulations, or (ii) my trustee has accepted such property as an asset of the trust by a separate writing specifically

- 10 -

referencing this paragraph and delivered to the current beneficiaries of the trust (or their legal representative or guardian)..

(i)     In determining whether to make any distribution to a beneficiary, my trustee may take into account the beneficiary's independent income and assets and any other trust from which distributions may be made to the beneficiary. My trustee is authorized to accept a beneficiary's written statement as to his income and assets.

(j)     If my trustee determines that a beneficiary is a minor or is under any other disability, my trustee may still make distributions to the beneficiary, or my trustee may make distributions to the beneficiary's parent, guardian, or conservator, or to a custodian for the beneficiary under an appropriate Uniform Transfers to Minors Act or similar law, or to an individual with whom the beneficiary resides, or to the trustee of any special needs or supplemental needs trust established by my trustee or another person for the beneficiary, or my trustee may apply distributions for the beneficiary's benefit in such manner as my trustee deems advisable.

(k)     No distribution by my trustee to a beneficiary, including a distribution under a power of appointment, shall be held to discharge any individual's obligation to support the beneficiary. Further, no individual other than myself shall participate as a trustee in the exercise of any discretionary power to distribute the income or principal of a trust to himself, or to or on behalf of any individual to whom he or his spouse has a legal obligation of support, where such power would constitute a general power of appointment as defined in the Code.

(l)     All trusts created pursuant to this Trust Agreement are "spendthrift trusts". Accordingly, no beneficiary, shall have the power to anticipate, transfer, sell, assign or encumber any payment or distribution of either principal or income, and any anticipation, transfer, sale, assignment or encumbrance by any beneficiary, whether of principal or income, whether by voluntary act, involuntary act or by operation of law, shall be void and of no effect whatsoever, and no distribution or payment shall be made by my trustee to any creditor, assignee, receiver, referee in bankruptcy, or trustee in bankruptcy of any beneficiary. The foregoing spendthrift provisions are a material purpose of the trusts established hereunder.

(m)     Any individual trustee shall be entitled to receive commissions in accordance with New Jersey law, including interim commissions on account without court approval. Any corporate fiduciary shall be entitled, without court approval, to receive compensation for its services as sole or co-trustee in accordance with its schedule of rates, including minimum fees and separate compensation for real estate, interests in closely-held businesses, and other special investments, as published from time to time and in effect at the time the services are rendered, without reduction for any fees or compensation payable by the trust, or by any entity in which the trust has invested, to any affiliate of the trustee. I recognize that such compensation to a corporate fiduciary may exceed the compensation otherwise allowed for such services under applicable law.

(n)     During any period in which I am alive and not incapacitated, my trustee shall render to me whenever I request, but not more frequently than annually, an account of the trust's receipts and disbursements of income and principal since the last accounting, or since the inception of the trust if there has not previously been an accounting. My written approval as to all matters covered

in any such accounting shall be final and binding upon me and all persons who may thereafter become entitled to any of the income or principal of the trust fund. Further, in the event of my death or incapacity, the absence of any request by me for an accounting shall be deemed an approval of my trustee's administration of the trust up to the date of my death or incapacity.

(o)     During any period in which I am incapacitated, and at any time after I have died, the trustee of any trust may, in its discretion, render an account of the trust's receipts and disbursements of income and principal since the last accounting. If the trustee has not rendered such an account during any three-year period, it shall do so if requested by a majority of the beneficiaries. The written approval of any such accounting by a majority of the beneficiaries shall be final and binding upon me and all persons who may thereafter become entitled to any of the income or principal of the trust fund. Nothing contained herein shall preclude my trustee from submitting an account to a court for settlement.

(p)     In order to eliminate unnecessary transfers and reduce expenses, my trustee may permit any asset or amount to be distributed directly to a beneficiary if the asset or amount would otherwise, upon being distributed to the trust, be distributable to the beneficiary.

(q)     Notwithstanding any other provision of this Trust Agreement, to the extent that any trust created hereunder is the beneficiary of a retirement account, any distribution received by such trust from a retirement account shall immediately be distributed by my trustee to the primary beneficiary of such trust. For purposes of this Trust Agreement, the term "retirement account" means any plan, trust, account, or arrangement including an Individual Retirement Account ("IRA") as defined in Section 408 of the Code; a Roth IRA as defined in Section 408A of the Code; a "deemed" IRA or Roth IRA under Section 408(q) of the Code; an annuity or mutual fund custodial account under Section 403(b) of the Code; a qualified cash or deferred arrangement under Section 401(k) of the Code; a pension, profit sharing, stock bonus or other retirement plan that is qualified under Section 401(a) of the Code; or any other retirement plan or arrangement that is subject to the "minimum distribution rules" of Sections 401(a)(9), 403(b)(10), 408(a)(6), 408(b)(3), or 457(d)(2) of the Code and the regulations thereunder, or equivalent rules under any other Internal Revenue Code section.

(r)     At the time an Age Restrictions Trust which is a beneficiary of one or more IRAs terminates as a result of the primary beneficiary reaching a designated age set forth in the Age Restrictions Trust, my trustee shall direct the IRA custodian(s) to re-title the beneficiary's share of the inherited IRA account in a manner similar to the following: Sandra A. Wynne IRA f/b/o [Beneficiary Name]. Thereupon, that beneficiary shall become the owner and beneficiary of those IRAs.

(s)     My trustee, acting in its fiduciary capacity, is authorized to make discretionary allocations of receipts and expenses between income and principal (even though a particular allocation may be inconsistent with otherwise applicable state law) and, to the extent authorized by regulation section 1.643(a)-3, include capital gains in distributable net income.

(t)     No power of appointment otherwise exercisable by an individual with respect to any interest in a trust shall be effective over any property, or over any income (current or accumulated) derived from any property, to the extent that the individual shall have at any time made a qualified

- 12 -

disclaimer (within the meaning of section 2518 of the Code) with respect to such property. Further, no power of appointment otherwise exercisable by an individual with respect to any interest in a trust may be exercised in a manner which would increase that trust's inclusion ratio for federal generation-skipping transfer tax purposes.

(u)     Notwithstanding any provisions relating to the disposition of trusts, with respect to any trust which is subject to the law of a jurisdiction which has maintained the Rule Against Perpetuities or a similar law ("Perpetuities Law"), at such time as mandated by such Perpetuities Law, the remaining balance of the trust shall be paid outright to the individual who then is entitled to the trust's income, or who in my trustee's discretion then may be entitled to the trust's income, and the trust shall then terminate. If there is more than one such individual entitled to the trust's income, the trust shall be divided among and distributed to such individuals, per stirpes, with reference to their closest common ancestor.

(v)     Where a trust is to be funded initially by an amount which will be covered only in part by an allocation of federal generation-skipping transfer tax exemption, my trustee shall divide that amount into two separate trusts, one consisting of the portion so covered which will thereby have a zero inclusion ratio, and the other consisting of the balance. Further, where an amount is to be added to an existing trust, or there is to be an allocation of federal generation-skipping transfer tax exemption to an existing trust, and the trust would otherwise thereafter have an inclusion ratio greater than zero, my trustee shall first divide the trust into two separate trusts, one holding assets equal to the amount of the allocation which will thereby have a zero inclusion ratio, and the other consisting of the balance of the assets. Any reference to such a trust shall thereafter be considered a reference to each of the separate trusts so created by my trustee. Any such separate trust created on account of my death shall be funded not later than 15 months after my death, valuing assets transferred in kind at their fair market value when transferred; provided, however, that my trustee shall comply with such other requirements as may apply for separate trusts to be recognized for generation-skipping transfer tax purposes.

(w)     Where (i) distributions are to be made from two or more trusts to two or more beneficiaries (or to trusts for such beneficiaries), (ii) one or more but not all of such distributions would constitute a generation-skipping transfer as defined in the Code, and (iii) one or more but not all of the distributing trusts have a zero inclusion ratio, then my trustee is directed to fund the gifts which would be generation-skipping transfers from the trust(s) with a zero inclusion ratio to the greatest extent possible, and to fund correspondingly greater portions of the gifts which would not be generation-skipping transfers from the trust(s) with an inclusion ratio greater than zero, it being my intent that my trustee allocate the funding of such gifts so as to minimize the total amount of generation-skipping transfer taxes imposed upon all beneficiaries' interests in the trusts.

(x)     I recognize that one or more of the trusts established hereunder may become the recipient of stock of one or more S corporations as defined in section 1361 of the Code. My trustee shall have the right to make an election under section 1361(d)(2) to treat all or part of such trust as a qualified subchapter S trust as defined in the Code with respect to stock it holds or to make an election under section 1361(e)(3) to be an electing small business trust. Any such election may be revoked by my trustee as provided in the Code and new elections may thereafter be made by my

- 13 -

trustee as allowed by the Code. If my trustee makes the election to be a qualified subchapter S trust as defined in section 1361(d)(3) of the Code and, if at any time a trust would be a qualified subchapter S trust as defined in the Code with respect to stock it holds but for one or more provisions conflicting with the requirements of section 1361(d)(3) of the Code, then such stock shall be held as and shall constitute a separate trust subject to the terms and conditions of the original trust, except that such trust shall in all events be governed by the following terms in lieu of any such conflicting provisions:

During the primary beneficiary's life, all of the trust's income (within the meaning of section 643(b) of the Code) will be currently distributed to him.

Any distributions of principal may be made only to the primary beneficiary.

The primary beneficiary's income interest shall terminate at the earlier of his death and the trust's termination.

If the trust terminates during the primary beneficiary's life, all of its assets shall be distributed to the primary beneficiary.

(s)     If after I have died my trustee ever determines that a trust is too small to administer economically, my trustee may distribute the trust to the primary beneficiary, and the trust shall then terminate.  If there is more than one primary beneficiary, the trust shall be divided among and distributed to such individuals per stirpes with reference to their closest common ancestor.  This paragraph shall not apply to a trust during the period when (i) such trust holds assets with a value in excess of one hundred thousand dollars ($100,000), and (ii) the trustee or co-trustees of such trust are also the primary beneficiary(ies ) of such trust.

(y)     For purposes of this Trust Agreement, the term "digital asset" shall refer to (1) Email accounts--Yahoo, Gmail, MSN, Comcast, AOL, or similar; (2) Social Networking Sites--Facebook, LinkedIN, Google+, Twitter, MySpace, or similar; (3) Online Storage Accounts--iCloud, Carbonite, Dropbox, mac.com, or similar; (4) Financial Accounts--Bank Accounts, Brokerage Accounts, Stock Accounts, Bill Paying Accounts, Student Loan Accounts, Home Equity Lines, Business Lines of Credit or similar; (5) Photo Storage Accounts--Kodak, Flickr or similar; (6) Personal or Company Websites or Blogs; (7) Auction Sites such as EBay or similar; (8) Music and Application Accounts-iTunes, iBooks, Kindle, Android or similar; (9) Virtual Property-Second Life, World of Warcraft, other role playing identities; (10) Payment services such as Pay Pal, Apple Pay, Google Pay, Amazon Prime or similar; (11) Other assets which are accessed through the internet digitally or otherwise, but for which there is no physical existence; (12) Internet access to items for which there was and still may be a physical existence in addition to a virtual existence; (13) Software licenses, domain registrations, user names, passwords; (14) Online bill paying accounts, online award of miles, points and other benefits arising from or attributable to using credit or debit cards; (15) Any other form of account or manner of transacting business done digitally as opposed to through the use of paper or done digitally even if never done through the use of paper; and (16) Any webpage, website, home page or page or account where digital information is stored, without regard to whether it is protected.  The foregoing list is not intended to be exclusive; it is intended to enumerate some of the digital devices which are currently in use.  It is my expectation that other

- 14 -

digital devices will also become a part of the marketplace, and that this particular power is intended to apply to those items as well. The fact that a specific type of product is not mentioned shall not be construed as evidence of any intention on my part to have omitted such product.

The provisions in this Trust Agreement addressing digital assets are to be construed to be my lawful consent under the Electronic Communications Privacy Act of 1986, as amended, The computer Fraud and Abuse Act of 1986, as amended, The New Jersey Uniform Fiduciary Access to Digital Assets Act, as amended, and any other applicable state or federal privacy law or criminal law. I am aware of the existence of the Stored Communications Act and that there are provisions in such act (Section 2707) which provide for a civil action for the violation of such Act. I direct my trustee not to seek any relief under such act if the basis for such relief is solely the compliance by an entity with a request by my trustee for Digital Information. I direct my trustee to provide to the entity from which the digital assets or digital information is being sought such reasonable assurances as are requested to insulate the disclosing entity from all such civil and criminal actions.

IN WITNESS WHEREOF, my trustee and I have executed this restated Trust Agreement on the above date.

WITNESS:

_____     _____ (L.S.)
                                     Erick Devine, Grantor and Trustee

STATE OF NEW JERSEY:

COUNTY OF SOMERSET:

ss.:

On this _22nd_ day of March, 2018, before me, a notary public of the State of New Jersey, personally appeared **Erick Devine**, who I am satisfied is the grantor and trustee named in the foregoing restated Trust Agreement, and he acknowledged that he executed it as his voluntary act for the uses and purposes expressed therein.

_Alice E Corjescu_
A Notary Public of New Jersey

ALICE E CORJESCU
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES MARCH 25, 2022

Prepared by:

Joseph M. Lemond, Esq.
Herold Law, P.A.
25 Independence Boulevard
Warren, New Jersey   07059-6747

H:\ESTPLAN\REVTRSTS\A-F\DEVINE\ERICK (2-2018).DOCX   3/22/18

- 16 -

# EXHIBIT B

# STATE OF NEW JERSEY

2000961588

NEW JERSEY DEPARTMENT OF HEALTH

## CERTIFICATE OF DEATH

STATE FILE NUMBER
20190022973

| 1a. Legal Name of Decedent *(First, Middle, Last, Suffix)*<br>**Erick Devine** | | | | LIMB<br>ONLY |
|---|---|---|---|---|
| 1b. Also Known As (AKA), If Any *(First, Middle, Last, Suffix)*<br>Cecil Erick Devine | | | | |

| 2. Sex<br>Male | 3. Social Security Number<br>-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 | 4a. Age<br>64 Years | 5. Date of Birth *(Mo/Day/Yr)*<br>05/01/1954 |
|---|---|---|---|

| 6. Birthplace *(City & State/Foreign County)*<br>Galveston, Texas | | | |
|---|---|---|---|
| 7a. Residence-State<br>New Jersey | 7b. County<br>Bergen | 7c. Municipality/City<br>Woodcliff Lake Borough | |
| 7d. Street and Number<br>29 Campbell Avenue | | 7e. Apt No. | 7f. Zip Code<br>07677 |
| 8a. Ever in US Armed Forces?<br>No | 8b. If Yes, Name of War | 8c. War Service Dates (From/To): | 7g. Inside City Limits?<br>Yes |

| 9. Domestic Status at Time of Death<br>Single/Never Married | 10. Name of Surviving Spouse/Partner *(Name given at birth or on birth certificate)* |
|---|---|
| 12. Father's Name *(First, Middle, Last)*<br>JC Devine | |
| 12. Mother's Name Prior to First Marriage *(First, Middle, Last)*<br>Dorothy Jean King | |

| 13a. Name of Informant<br>Wandy Williams | 13b. Relationship to Decedent<br>Friend |
|---|---|
| 13c. Mailing Address *(Street and Number, City, State, Zip Code)*<br>609 Pulis Avenue #12, Mahwah, NJ 07430 | |

| 14. Method of Disposition<br>Cremation | 15. Place of Disposition *(name of cemetery, crematory, other)*<br>Garden State Crematory | 16. Location - City & State/Foreign County<br>North Bergen Township, New Jersey |
|---|---|---|
| 17. Name and Complete Address of Funeral Facility<br>BECKER FUNERAL HOME, 219 Kinderkamack Road, Westwood, NJ 07675 | | |
| 18. Electronic Signature of Funeral Director<br>*Jake G DeZerga* | | 19. NJ License Number<br>23JP00508500 |

| 20. Decedent Education<br>Master's degree (MA, MS, MEng, Med, MSW, MBA) | 21. Decedent of Hispanic Origin?<br>Not Spanish / Hispanic / Latino | 22. Decedent Race<br>White; American Indian or<br>Alaska Native; Greek |
|---|---|---|
| 23. Occupation of Decedent *(Type of work done most of life, even if retired)*<br>Actor/Director/Acting Coach | 24. Kind of Business/Industry<br>Film/Theatre | |
| 25. Name and Address of Last Employer<br>Self-Employed | | |

| 26. Date Pronounced Dead *(Mo/Day/Yr)*<br>04/18/2019 | 20. Name of Person Pronouncing Death<br>*Jessica McLane* | |
|---|---|---|
| 27. Time Pronounced Dead (24-h)<br>0038 | 29. License Number<br>25MB09016500 | 30. Date Signed *(Mo/Day/Yr)*<br>04/18/2019 |
| 31. Date of Death *(Mo/Day/Yr)*<br>04/18/2019 | 32. Time of Death (24-h)<br>0036 | 33. Was Medical Examiner Contacted?<br>Yes | 34. Place of Death<br>Hospital; Emergency<br>Room/Outpatient |
| 35a. Facility Name *(If not Institution, give street and number)*<br>HackensackUMC At Pascack Valley | | | |
| 35b. Municipality<br>Westwood Borough | | 35c. County<br>Bergen | |

**CAUSE OF DEATH:**

| 36a. PART I - IMMEDIATE CAUSE - final disease or condition resulting in death. Subsequently list conditions, if any, leading to the cause listed on Line a. Enter the UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST. | Interval Between Onset and Death |
|---|---|
| Immediate Cause<br>a. Hypertensive, atherosclerotic, and diabetic cardiovascular disease | many years |
| Due to (or as a consequence of):<br>b. | |
| Due to (or as a consequence of):<br>c. | |
| Due to (or as a consequence of):<br>d. | |

| 36b. PART II - Enter other significant conditions contributing to death but not resulting in underlying cause given in PART I.<br><br>Obesity | 37. Was an Autopsy Performed?<br>No |
|---|---|
| | 38. Were Autopsy Findings Available to Complete Cause of Death?<br>Not Applicable |

| 39. Date of Injury *(Mo/Day/Yr)* | 40. Time of Injury (24-h) | 41. Place of Injury *(e.g. home, construction site, restaurant)* | 42. Injury at work? |
|---|---|---|---|
| 43a. Location of Injury *(Number and Street, Zip Code)* | | 43b. Municipality | 43c. County | 43d. State |
| 44. Describe How Injury Occurred | | | 45. If Transportation Injury: |

| 46. Manner of Death<br>Natural | 47. Did Decedent<br>Have Diabetes?<br>Yes | 48. Did Tobacco Use<br>Contribute to Death?<br>Unknown | 49. If Female, Pregnancy State<br>Not applicable |
|---|---|---|---|
| 50. Certifier Type<br>Medical Examiner | 51. Name, Address, and Zip Code of Certifier<br>Zhongxue Hua, M.D.<br>351 E. Ridgewood Ave., Paramus, NJ 07652 | | |
| 52. Electronic Signature of Certifier<br>*Zhongxue Hua* | 53. License Number<br>25MA00219500 | 54. Date Certified *(Mo/Day/Yr)*<br>04/18/2019 |
| 55. Electronic Signature of Local Registrar<br>*Christine L Compesi* | 56. District No.<br>V0236 | 57. Date Received<br>04/22/2019 | Case ID Number<br>2084349 |

DATE ISSUED:   *April 22, 2019*

ISSUED BY:
*Westwood Borough*

*Christine L Compesi, Deputy Registrar*

This is to certify that the above is correctly copied
from a record on file in my office.
*Certified copy not valid unless the raised Great
Seal of the State of New Jersey or the seal of the
issuing municipality or county, is affixed hereon.*

Vincent T. Arrisi
State Registrar
Office of Vital Statistics and Registry

REG-42B
JUN 14

Record
Contains
Amendment

THIS DOCUMENT CONTAINS A UNIQUE STATE OF NJ WATERMARK HOLD AT LIGHT TO VERIFY

# EXHIBIT C

# STOCK PURCHASE AGREEMENT

## FOR

## FISHER ENTERPRISES, INC.

This is an Agreement executed on January 12, 1999, between Fisher Enterprises, Inc., an Oklahoma Corporation, hereinafter called "the Corporation", and James Dennis Devine Revocable Trust, dated October 3, 1996, Erick Devine Revocable Trust, dated August 16, 1995, and Donald W. Stephens Revocable Trust, dated March 21, 1997, hereinafter referred to collectively as "the shareholders"; and each singly as "a shareholder".

The shareholders own certain capital stock (hereinafter referred to as "Shares") of the Corporation as indicated on Exhibit A, and they and the Corporation desire the stock to remain closely held in order to promote harmonious management of the Corporation's affairs.

Therefore, the shareholders and the Corporation agree as follows:

## 1. PURCHASE OBLIGATION UPON DEATH.

Upon the death of a shareholder, his estate shall sell and the Corporation shall either purchase the Shares which were owned by the deceased shareholder at his death for the price and upon the other terms hereinafter provided, or waive its right to purchase the Shares. If the Corporation elects to waive its right herein, said waiver shall be communicated in writing to the executor of the deceased shareholder and all surviving shareholders within thirty days of the date of death of the deceased shareholder. Nothing herein shall extend the date for closing as provided in paragraph 8 below. To the extent the Corporation is prevented by law from purchasing any Shares owned by the deceased shareholder's estate, or if the Corporation waives its right to purchase any Shares, each surviving shareholder shall purchase pro rata from the deceased shareholder's estate, and the latter shall sell, for the price and upon the other terms hereinafter provided, the Shares not purchased by the Corporation.

## 2. OPTION UPON VOLUNTARY TRANSFER.

2(a) NOTICE OF TRANSFER. If a shareholder intends to transfer Shares of which he is owner to any person other than the Corporation, he shall give 60 days written notice to the Corporation and the remaining shareholders of his intention so to transfer. The notice, in addition to stating the fact of the intention to transfer Shares, shall state (i) the number of Shares to be transferred, (ii) the name, business and residence address of the proposed transferee, (iii) whether or not the transfer is for a valuable consideration, and, if so, the amount of the consideration and the other terms of the sale, (iv) that the proposed transferee agrees to become a party to this Stock Purchase Agreement as a condition of acquiring the Shares.

1

2(b) PRIMARY OPTION TO PURCHASE.  Within 60 days of receipt of the notice, the Corporation may exercise an option to purchase all or any portion of the Shares proposed to be transferred for the price and upon the other terms hereinafter provided. If the Corporation does not exercise its option to purchase all or any portion of such Shares, each remaining shareholder (within 70 days of the Corporation's receipt of the notice of the proposed transfer) may exercise an option to purchase that proportion of such unpurchased Shares which the number of the Shares owned by each such remaining shareholder at the time of the Corporation's receipt of said notice bears to the total number of the Shares then owned by all such remaining shareholders. The purchase option granted in this paragraph is sometimes hereinafter referred to as the "Primary Option".

2(c) SECONDARY OPTION TO PURCHASE. If any Primary Option remains unexercised, each remaining shareholder who has exercised his Primary Option may within ten days after the expiration of the 70-day option period provided for in paragraph 2(b) exercise an option to purchase pro rata the unpurchased Shares. The Purchase Option granted by this paragraph is sometimes hereinafter referred to as the "Secondary Option".

2(d) COMPLETE EXERCISE.  The Corporation and the remaining shareholders must in the aggregate exercise their options to purchase all of the Shares to be transferred or forfeit their options.

2(e) DEATH BEFORE CLOSING.  If a shareholder who proposes to transfer Shares dies prior to the closing of the sale and purchase contemplated by this paragraph 2, his Shares shall be the subject of sale and purchase under paragraph 2.

3.  **OPTION UPON INVOLUNTARY TRANSFER.**

If other than by reason of a shareholder's death, Shares are transferred by operation of law or pursuant to court order to any person other than the Corporation (such as, but not limited to, a shareholder's trustee in bankruptcy, a shareholder's spouse upon divorce, a purchaser at any creditor's or court sale or the guardian or conservator of an incompetent shareholder), the Corporation or the remaining shareholders, within 70 days of the Corporation's receipt of actual notice of the transfer in the case of a Primary Option and within 80 days of such event in the case of a Secondary Option, may exercise an option to purchase all but not less than all of the Shares so transferred in the same manner and upon the same terms as provided in paragraph 2, with respect to Shares proposed to be transferred.

4.  **EXERCISE OF OPTIONS AND EFFECT OF NON-EXERCISE OF OPTIONS.**

All options granted herein shall be exercised by delivery of written notice of their exercise completed within the times provided herein.  If, in the case of a paragraph 2 transfer, the transfer is not upon the terms or is not to the transferee stated in the notice required of the transferring shareholder by paragraph 2, or is not completed within ten days of the lapse of all options granted in paragraph 2, or the transferor, after the transfer, reacquires all or

2

any portion of the transferred Shares, the Shares transferred shall remain subject to this Agreement as if no transfer had been made.

### 5. PURCHASE PRICE.

The purchase price of Shares shall be determined in accordance with the provision of Exhibit B hereto.

### 6. PLEDGE OF SHARES PROHIBITED.

No shareholder shall encumber or use any of his Shares as security for any loan, except upon the written consent of all of the parties to this Agreement.

### 7. PAYMENT OF THE PURCHASE PRICE.

7(a) DOWN PAYMENT. The purchase price of Shares shall be paid in cash except that at the option of the purchasing party or parties, 80% of the purchase price may be deferred and 20% paid at closing.

7(b) PROMISSORY NOTE. The deferred portion of the price shall be evidenced by the promissory note of each purchasing party made payable to the order of the selling party. The note of a purchasing party shall be in substantially the form of that set forth in Exhibit C. The interest rate for such installment promissory note shall be equal to the interest rate determined in accordance with Internal Revenue Code Section 7872 as of the date of the closing as specified in paragraph 8.

7(c) CORPORATION AS OBLIGOR. If the maker of the note is the Corporation, the note shall be unsecured but the note shall be guaranteed by each surviving or remaining shareholder in substantially the form of that attached as Exhibit C-1, and all Shares owned by each such surviving or remaining shareholder, excepting those required to be pledged as provided in paragraph 7(d), shall be pledged by him to the payee of the note to secure the payment of the guarantee.

7(d) SHAREHOLDER AS OBLIGOR. If the maker of the note is a shareholder, the note shall be secured by the shareholder's pledge to the payee of the note of the Shares purchased plus any Shares he owns which are not required to be pledged under the provisions of paragraph 7(c). The form of the note set forth in Exhibit C shall contain, as an additional paragraph immediately preceding the signature line, the supplementary paragraph also set forth in Exhibit C.

7(e) LIFE INSURANCE. Notwithstanding paragraph 7(a), if the Corporation or other purchasing party is the owner and beneficiary of any insurance on the life of a deceased shareholder from whose estate the Corporation or other purchasing party is purchasing Shares, an amount equal to the death benefits payable to the beneficiary under the policy or policies shall be paid in cash to the estate of the deceased shareholder on account of the purchase price of the Shares, and only the balance, if any, may be deferred as

3

provided in paragraph 7(a). If the insurance proceeds exceed the purchase price of the Shares, the excess shall be paid to the estate of the deceased shareholder as additional consideration for the Shares.

## 8. THE CLOSING.

Unless otherwise agreed by the parties, the closing of the sale and purchase of Shares shall take place at the general offices of the Corporation within 60 days of the death of a shareholder or the exercise of any option provided in this Agreement. Upon the closing the selling shareholder shall deliver to the Corporation his resignation and that of his nominees, if any, as officers and directors of the Corporation and any of its subsidiaries. The sale and purchase of Shares which the surviving or remaining shareholders are to purchase shall take place immediately prior to the sale and purchase of Shares, if any, which the Corporation is to purchase.

## 9. LEGEND ON CERTIFICATES.

All Shares now or hereafter owned by the shareholders shall be subject to the provisions of this Agreement, and the certificates representing same shall bear the following legend:

"The sale, transfer or encumbrance of this certificate is subject to an agreement dated January 12, 1999, a copy of which is on file in the office of the Secretary of the Corporation. The Agreement provides for certain obligations to sell and to purchase the Shares of stock evidenced by this certificate. By accepting the Shares of stock, the holder of this certificate agrees to be bound by this agreement."

## 10. TERMINATION.

This Agreement and all restrictions on stock transfer created hereby shall terminate on the occurrence of any of the following events:

10(a) The bankruptcy or dissolution of the Corporation.

10(b) A single shareholder becoming the owner of all the Shares of the Corporation which are the subject of this Agreement.

10(c) The execution of a written instrument by the Corporation and all of the shareholders who then own Shares subject to this Agreement which terminates the same.

## 11. INSURANCE ON SHAREHOLDER'S LIVES.

The Corporation may desire to insure, or partially insure, its promise to purchase from a deceased shareholder's estate, Shares which he owned prior to his death. Therefore, the

Corporation may purchase, be the owner and beneficiary of and may, from time to time, but shall not be obligated to continue in force, insurance policies on the lives of the shareholders as set forth in Exhibit D, as amended from time to time.

## 12. GENERAL PROVISIONS.

12(a)  REMEDIES FOR BREACH. The Shares are unique chattels, and each party to this Agreement shall have the remedies which are available to him or it for the violation of any of the terms of this Agreement, including, but not limited to, the equitable remedy of specific performance.

12(b)  BINDING EFFECT. This Agreement is binding upon and inures to the benefit of the Corporation, its successors and assigns and to the shareholders and their respective heirs, personal representatives, successors and assigns.

12(c)  PRIOR AGREEMENTS. This Agreement supersedes all prior written and oral Agreements between the parties regarding the purchase of Shares of the Corporation.

12(d)  SEVERABILITY. If any provision of this Agreement shall be adjudged invalid, such adjudication shall not affect the remaining provisions of this Agreement and it shall be construed in all respects as if any invalid or unenforceable provisions were omitted.

12(e)  AMENDMENT. No change or modification of this Agreement shall be valid unless the same be in writing and signed by all of the parties hereto.

IN WITNESS WHEREOF, the Corporation and the shareholders have executed this Agreement on the date set forth above.

FISHER ENTERPRISES, INC.

By: _____
      President

ATTEST: _____
      Secretary

Shareholders _____

James Dennis Devine Revocable Trust,
dated October 3, 1996,
James Dennis Devine, Trustee

_____
Erick Devine Revocable Trust,
dated August 16, 1995
Erick Devine, Trustee

_____
Donald W. Stephens Revocable Trust,
dated March 21, 1997,
Donald W. Stephens, Trustee

5

# EXHIBIT A

### Shares Owned by the Shareholders

| NAME OF SHAREHOLDER | NUMBER OF SHARES OWNED |
|---|---|
| James Dennis Devine Revocable Trust, dated October 3, 1996 | 333  1/3 |
| Erick Devine Revocable Trust, dated  August 16, 1995 | 333  1/3 |
| Donald W. Stephens Revocable Trust, dated March 21, 1997 | 333  1/3 |

As Amended November 25, 2016

EXHIBIT B

Determination of the Purchase Price

1.  The price of Shares to be purchased under this Agreement shall be their Fair Market Value on the Valuation Date.

2.  The term "Fair Market Value" as used in paragraph 1 of this Exhibit B shall be an amount which bears the same proportion to the Net Worth (as defined below) of the Corporation as the number of Shares to be purchased bears to the total number of the Corporation's Shares outstanding on the Valuation Date.

3.  The "Valuation Date", as used herein, shall be:

    a.  In the case of a purchase under paragraph 1 of this Agreement, the last day of the month preceding the month in which the death of the deceased shareholder occurred.

    b.  In the case of a purchase under paragraph 2 of this Agreement, the last day of the month preceding the month in which the Corporation received the notice of the proposed transfer as provided in paragraph 2.

    c.  In the case of a purchase under paragraph 3 of this Agreement, the last day of the month preceding the month in which the Corporation received actual notice of a transfer of Shares.

4.  Subject at all times to paragraph 6 of this Exhibit B, the term "Net Worth" shall be an amount equal to the amount of the Corporation's assets, less the amount of its liabilities, on the Valuation Date as determined by the Corporation's accountants in accordance with generally accepted accounting principles, prepared on the accrual basis, but adjusted as follows:

    a.  Insurance, if any, owned by the Corporation on the life of a deceased shareholder whose Shares are the subject of purchase under paragraph 1 of this Agreement shall be valued at its cash value on the Valuation Date and not its face value.

    b.  No adjustment shall be made on account of an event occurring subsequent to the Valuation Date, whether the event constitutes an adjustment to the Federal or State income tax liability of the Corporation or otherwise.

    c.  Reserves for contingent liabilities shall not be treated as liabilities.

    d.  No amount shall be included for goodwill.

7

e.  There shall be added to the amount of depreciable assets, except assets described in paragraph (f) below, and there shall be deducted from the depreciation reserve with respect thereto the amount, if any, by which the depreciation reserve reflected on the Corporation's books of account exceeds the reserve calculated on a straight line basis.

f.  Real estate and the improvements thereon, but excluding assets described in paragraph (e) above, shall be valued at fair market value on the Valuation Date and not valued as shown on the Corporation's books of account. The value of the real estate and improvements shall be determined by an appraiser appointed by the joint written direction of the selling and purchasing parties executed and delivered to the appraiser within ten days of the appointment of a personal representative for the deceased shareholder's estate or other event requiring sale. If for any reason no appraisal is made as above provided, the appraisal shall be made by an appraiser who shall be appointed by a Judge of the Probate Court having jurisdiction over such matters, upon proper application made thereto by any interested party., The appraisal shall be in writing and when made shall be filed with the Corporation's accountants for their use in determining the Corporation's Net Worth.

g.  The Corporation's investment in wholly-owned subsidiaries shall be reflected at an amount equal to the Net Worth of the subsidiary determined in the same manner as herein provided for the determination of the Net Worth of the Corporation.

h.  Securities owned by the Corporation which are listed on any public exchange or over-the-counter shall be valued on the Valuation Date, or if this was not a trading day, then on the last day immediately preceding the Valuation Date on which the securities were traded.

i.  Merchandise inventory will be valued at historical cost regardless of the method used to value merchandise inventory for Federal income tax purposes.

j.  Oil & Gas Producing Reserves and the associated Reserve for Depletion on the books of the Corporation shall be excluded from the calculation of Net Worth and their values shall be replaced as herein described: All Oil & Gas Properties, whether mineral interest, royalty interest, over-riding royalty interest, working interests, or any other connotation applied to oil and gas properties, shall be valued by substituting the net cash receipts for all properties during the twelve months preceding the Valuation Date. ("Net cash receipts" is defined as gross cash receipts less the operating expenses associated with joint interest billings on working interest properties and taxes withheld or billed directly to the Corporation for all properties, and less Supervision Consultants expenses. Any expenditure(s) made for drilling, equipping and completion of any new well(s) or any expenditures made to re-complete any producing zones in an existing

8

producing well(s), including intangible drilling costs, shall be considered as operating expenses and shall be a deduction in determining "net cash receipts".)

    k.  Any Oil & Gas Property that is not-producing shall be valued at an amount equal to the value recorded on the books of the Corporation.

5.  In the case of a purchase of Shares under paragraph 2 of the Agreement, if the price, if any, offered to the proposed transferee is less than the purchase price determined under paragraph 4 or 6 of this Exhibit B, that price rather than the price so determined shall be the price of Shares to be purchased under this Agreement.

6.  The Corporation's Net Worth, if determined as provided in paragraph 4 above, shall be determined by the firm of certified public accountants regularly employed by the Corporation. If the Corporation does not regularly employ a certified public accounting firm, the officers and or shareholders of the Corporation may calculate the Corporation's Net Worth as set out in this Agreement, and that calculation shall be presumed true, correct, and complete.

9

# EXHIBIT C

## INSTALLMENT PROMISSORY NOTE

_____, 19__

<u>(THE CLOSING DATE)</u>

FOR VALUE RECEIVED, the undersigned (<u>insert name of guaranteeing shareholder</u>) promises to pay, to the order of (<u>the transferring shareholder, the transferee, or estate of the deceased shareholder</u>) the principal sum of $_____ (<u>deferred portion of the purchase price</u>) with interest at the rate of _____ % per annum from the date hereof on any principal sum balance from time to time unpaid. The principal sum of this Note shall be paid in ten (10) equal annual installments, the first installment to be payable at the end of one year from the date hereof and the remaining installments at the end of each succeeding year thereafter until the principal sum of this Note shall have been paid. Interest shall be paid at the same time as principal installments. Upon a default in payment of principal or interest continuing for 30 days after written notice then at the option of the holder all unpaid installments of principal and accrued interest due shall become immediately due and payable, and the holder shall be entitled to reimbursement for reasonable attorney's fees. At the option of the undersigned, all or any portion of this Note may be prepaid without premium or penalty, the amount of the prepayment to be applied first to accrued interest and the remainder to such unpaid principal installments as the undersigned shall designate in a written prepayment notice delivered to the holder of this note concurrently with the making of the prepayment, provided that no such prepayment can be made during the calendar year in which the note is executed.

<u>(SIGNATURE OF PURCHASER)</u>

*****************************

(Note: The following paragraph is to be inserted before the signature if the maker is a shareholder.)

The undersigned hereby transfers, pledges and delivers to (<u>name of mutually agreeable and bonded Trustee</u>) the following property as collateral security for the payment of this note.

<u>(insert description of certificates which are to be pledged by the maker of the note)</u>

And the undersigned hereby gives the payee, or the holder hereof, all rights granted to a secured party under the Uniform Commercial Code. So long as the undersigned is not in default in the payment of any sums due under this promissory note, the undersigned shall have the right to vote all certificates of stock pledged to the payee hereunder.

## EXHIBIT C-1

### GUARANTEE

The undersigned, (insert name of guaranteeing shareholder), does hereby guarantee payment when due by (insert name of the Corporation) of each installment of principal and interest due on its promissory note, dated (the closing date), which is payable to the order of (the transferring shareholder, the transferee, or estate of the deceased shareholder) in the principal sum of $_____ (deferred portion of the purchase price). Upon default by (insert name of the Corporation) to make any of the principal or interest payments due on said note for a period of 30 days or more, the undersigned agrees that the holder of said promissory note may, without seeking to collect any such due amounts from (insert name of the Corporation), demand and receive payment of all principal and interest due under the note from the undersigned.

The undersigned hereby transfers, pledges and delivers to (name of mutually agreeable and bonded Trustee) for the benefit of (the transferring shareholder, the transferee, or estate of the deceased shareholder) hereinafter referred to as "the Payee;" the following property as collateral security for the discharge of the guarantee herein made:

(insert description of Shares which are to be purchased and pledged by the guarantor) and the undersigned hereby gives the Payee all rights of a secured party under the Uniform Commercial Code.

So long as (insert name of the Corporation) is not in default in the performance of its obligation under said promissory note, or so long as the undersigned is not in default in the performance of his obligations under this guarantee, the undersigned shall have the right to vote all certificates of stock pledged to the payee hereunder.

DATED (the closing date).

(guaranteeing shareholder)

11

# EXHIBIT D

## INSURANCE POLICIES ON THE LIVES OF THE SHAREHOLDERS

| NAME OF INSURED | POLICY NUMBER | NAME OF ISSUING COMPANY | FACE AMOUNT OF POLICY |
|---|---|---|---|
| _____ | _____ | _____ | $_____ |
| _____ | _____ | _____ | $_____ |
| _____ | _____ | _____ | $_____ |

12

# EXHIBIT D

## STOCK PURCHASE AGREEMENT

## FOR

## KING PROPERTIES, INC.

This is an Agreement executed on January 12, 1999, between King Properties, Inc., an Oklahoma Corporation, hereinafter called "the Corporation", and James Dennis Devine Revocable Trust, dated October 3, 1996, Erick Devine Revocable Trust, dated August 16, 1995, and Donald W. Stephens Revocable Trust, dated March 21, 1997, hereinafter referred to collectively as "the shareholders", and each singly as "a shareholder".

The shareholders own certain capital stock (hereinafter referred to as "Shares") of the Corporation as indicated on Exhibit A, and they and the Corporation desire the stock to remain closely held in order to promote harmonious management of the Corporation's affairs.

Therefore, the shareholders and the Corporation agree as follows:

### 1. PURCHASE OBLIGATION UPON DEATH.

Upon the death of a shareholder, his estate shall sell and the Corporation shall either purchase the Shares which were owned by the deceased shareholder at his death for the price and upon the other terms hereinafter provided, or waive its right to purchase the Shares. If the Corporation elects to waive its right herein, said waiver shall be communicated in writing to the executor of the deceased shareholder and all surviving shareholders within thirty days of the date of death of the deceased shareholder. Nothing herein shall extend the date for closing as provided in paragraph 8 below. To the extent the Corporation is prevented by law from purchasing any Shares owned by the deceased shareholder's estate, or if the Corporation waives its right to purchase any Shares, each surviving shareholder shall purchase pro rata from the deceased shareholder's estate, and the latter shall sell, for the price and upon the other terms hereinafter provided, the Shares not purchased by the Corporation.

### 2. OPTION UPON VOLUNTARY TRANSFER.

2(a) NOTICE OF TRANSFER. If a shareholder intends to transfer Shares of which he is owner to any person other than the Corporation, he shall give 60 days written notice to the Corporation and the remaining shareholders of his intention so to transfer. The notice, in addition to stating the fact of the intention to transfer Shares, shall state (i) the number of Shares to be transferred, (ii) the name, business and residence address of the proposed transferee, (iii) whether or not the transfer is for a valuable consideration, and, if so, the amount of the consideration and the other terms of the sale, (iv) that the proposed transferee agrees to become a party to this Stock Purchase Agreement as a condition of acquiring the Shares.

1

2(b) PRIMARY OPTION TO PURCHASE. Within 60 days of receipt of the notice, the Corporation may exercise an option to purchase all or any portion of the Shares proposed to be transferred for the price and upon the other terms hereinafter provided. If the Corporation does not exercise its option to purchase all or any portion of such Shares, each remaining shareholder (within 70 days of the Corporation's receipt of the notice of the proposed transfer) may exercise an option to purchase that proportion of such unpurchased Shares which the number of the Shares owned by each such remaining shareholder at the time of the Corporation's receipt of said notice bears to the total number of the Shares then owned by all such remaining shareholders. The purchase option granted in this paragraph is sometimes hereinafter referred to as the "Primary Option".

2(c) SECONDARY OPTION TO PURCHASE. If any Primary Option remains unexercised, each remaining shareholder who has exercised his Primary Option may within ten days after the expiration of the 70-day option period provided for in paragraph 2(b) exercise an option to purchase pro rata the unpurchased Shares. The Purchase Option granted by this paragraph is sometimes hereinafter referred to as the "Secondary Option".

2(d) COMPLETE EXERCISE. The Corporation and the remaining shareholders must in the aggregate exercise their options to purchase all of the Shares to be transferred or forfeit their options.

2(e) DEATH BEFORE CLOSING. If a shareholder who proposes to transfer Shares dies prior to the closing of the sale and purchase contemplated by this paragraph 2, his Shares shall be the subject of sale and purchase under paragraph 2.

3.   OPTION UPON INVOLUNTARY TRANSFER.

If other than by reason of a shareholder's death, Shares are transferred by operation of law or pursuant to court order to any person other than the Corporation (such as, but not limited to, a shareholder's trustee in bankruptcy, a shareholder's spouse upon divorce, a purchaser at any creditor's or court sale or the guardian or conservator of an incompetent shareholder), the Corporation or the remaining shareholders, within 70 days of the Corporation's receipt of actual notice of the transfer in the case of a Primary Option and within 80 days of such event in the case of a Secondary Option, may exercise an option to purchase all but not less than all of the Shares so transferred in the same manner and upon the same terms as provided in paragraph 2, with respect to Shares proposed to be transferred.

4.   EXERCISE OF OPTIONS AND EFFECT OF NON-EXERCISE OF OPTIONS.

All options granted herein shall be exercised by delivery of written notice of their exercise completed within the times provided herein. If, in the case of a paragraph 2 transfer, the transfer is not upon the terms or is not to the transferee stated in the notice required of the transferring shareholder by paragraph 2, or is not completed within ten days of the lapse of all options granted in paragraph 2, or the transferor, after the transfer, reacquires all or

2

any portion of the transferred Shares, the Shares transferred shall remain subject to this Agreement as if no transfer had been made.

## 5. PURCHASE PRICE.

The purchase price of Shares shall be determined in accordance with the provision of Exhibit B hereto.

## 6. PLEDGE OF SHARES PROHIBITED.

No shareholder shall encumber or use any of his Shares as security for any loan, except upon the written consent of all of the parties to this Agreement.

## 7. PAYMENT OF THE PURCHASE PRICE.

7(a) DOWN PAYMENT. The purchase price of Shares shall be paid in cash except that at the option of the purchasing party or parties, 80% of the purchase price may be deferred and 20% paid at closing.

7(b) PROMISSORY NOTE. The deferred portion of the price shall be evidenced by the promissory note of each purchasing party made payable to the order of the selling party. The note of a purchasing party shall be in substantially the form of that set forth in Exhibit C. The interest rate for such installment promissory note shall be equal to the interest rate determined in accordance with Internal Revenue Code Section 7872 as of the date of the closing as specified in paragraph 8.

7(c) CORPORATION AS OBLIGOR. If the maker of the note is the Corporation, the note shall be unsecured but the note shall be guaranteed by each surviving or remaining shareholder in substantially the form of that attached as Exhibit C-1, and all Shares owned by each such surviving or remaining shareholder, excepting those required to be pledged as provided in paragraph 7(d), shall be pledged by him to the payee of the note to secure the payment of the guarantee.

7(d) SHAREHOLDER AS OBLIGOR. If the maker of the note is a shareholder, the note shall be secured by the shareholder's pledge to the payee of the note of the Shares purchased plus any Shares he owns which are not required to be pledged under the provisions of paragraph 7(e). The form of the note set forth in Exhibit C shall contain, as an additional paragraph immediately preceding the signature line, the supplementary paragraph also set forth in Exhibit C.

7(e) LIFE INSURANCE. Notwithstanding paragraph 7(a), if the Corporation or other purchasing party is the owner and beneficiary of any insurance on the life of a deceased shareholder from whose estate the Corporation or other purchasing party is purchasing Shares, an amount equal to the death benefits payable to the beneficiary under the policy or policies shall be paid in cash to the estate of the deceased shareholder on account of the purchase price of the Shares, and only the balance, if any, may be deferred as

3

provided in paragraph 7(a). If the insurance proceeds exceed the purchase price of the Shares, the excess shall be paid to the estate of the deceased shareholder as additional consideration for the Shares.

8.   **THE CLOSING.**

Unless otherwise agreed by the parties, the closing of the sale and purchase of Shares shall take place at the general offices of the Corporation within 60 days of the death of a shareholder or the exercise of any option provided in this Agreement. Upon the closing the selling shareholder shall deliver to the Corporation his resignation and that of his nominees, if any, as officers and directors of the Corporation and any of its subsidiaries. The sale and purchase of Shares which the surviving or remaining shareholders are to purchase shall take place immediately prior to the sale and purchase of Shares, if any, which the Corporation is to purchase.

9.   **LEGEND ON CERTIFICATES.**

All Shares now or hereafter owned by the shareholders shall be subject to the provisions of this Agreement, and the certificates representing same shall bear the following legend:

"The sale, transfer or encumbrance of this certificate is subject to an agreement dated January 12, 1999, a copy of which is on file in the office of the Secretary of the Corporation. The Agreement provides for certain obligations to sell and to purchase the Shares of stock evidenced by this certificate. By accepting the Shares of stock, the holder of this certificate agrees to be bound by this agreement."

10.   **TERMINATION.**

This Agreement and all restrictions on stock transfer created hereby shall terminate on the occurrence of any of the following events:

10(a) The bankruptcy or dissolution of the Corporation.

10(b) A single shareholder becoming the owner of all the Shares of the Corporation which are the subject of this Agreement.

10(c) The execution of a written instrument by the Corporation and all of the shareholders who then own Shares subject to this Agreement which terminates the same.

11.   **INSURANCE ON SHAREHOLDER'S LIVES.**

The Corporation may desire to insure, or partially insure, its promise to purchase from a deceased shareholder's estate, Shares which he owned prior to his death. Therefore, the

4

Corporation may purchase, be the owner and beneficiary of and may, from time to time, but shall not be obligated to continue in force, insurance policies on the lives of the shareholders as set forth in Exhibit D, as amended from time to time.

## 12.  GENERAL PROVISIONS.

12(a)  REMEDIES FOR BREACH.  The Shares are unique chattels, and each party to this Agreement shall have the remedies which are available to him or it for the violation of any of the terms of this Agreement, including, but not limited to, the equitable remedy of specific performance.

12(b)  BINDING EFFECT.  This Agreement is binding upon and inures to the benefit of the Corporation, its successors and assigns and to the shareholders and their respective heirs, personal representatives, successors and assigns.

12(c)  PRIOR AGREEMENTS.  This Agreement supersedes all prior written and oral Agreements between the parties regarding the purchase of Shares of the Corporation.

12(d)  SEVERABILITY.  If any provision of this Agreement shall be adjudged invalid, such adjudication shall not affect the remaining provisions of this Agreement and it shall be construed in all respects as if any invalid or unenforceable provisions were omitted.

12(e)  AMENDMENT.  No change or modification of this Agreement shall be valid unless the same be in writing and signed by all of the parties hereto.

IN WITNESS WHEREOF, the Corporation and the shareholders have executed this Agreement on the date set forth above.


KING PROPERTIES, INC.                                    Shareholders

By: _____          _____
    President                          James Dennis Devine Revocable Trust,
                                       dated October 3, 1996,
                                       James Dennis Devine, Trustee

ATTEST: _____          _____
        Secretary                     Erick Devine Revocable Trust,
                                       dated August 16, 1995
                                       Erick Devine, Trustee

                                     _____
                                       Donald W. Stephens Revocable Trust,
                                       dated March 21, 1997,
                                       Donald W. Stephens, Trustee

5

# EXHIBIT A

Shares Owned by the Shareholders

| NAME OF SHAREHOLDER | NUMBER OF SHARES OWNED |
|---|---|
| James Dennis Devine Revocable Trust, dated October 3, 1996 | 333  1/3 |
| Erick Devine Revocable Trust, dated  August 16, 1995 | 333  1/3 |
| Donald W. Stephens Revocable Trust, dated March 21, 1997 | 333  1/3 |

6

As Amended November 25, 2016

EXHIBIT B

Determination of the Purchase Price

1.  The price of Shares to be purchased under this Agreement shall be their Fair Market Value on the Valuation Date.

2.  The term "Fair Market Value" as used in paragraph 1 of this Exhibit B shall be an amount which bears the same proportion to the Net Worth (as defined below) of the Corporation as the number of Shares to be purchased bears to the total number of the Corporation's Shares outstanding on the Valuation Date.

3.  The "Valuation Date", as used herein, shall be:

    a.  In the case of a purchase under paragraph 1 of this Agreement, the last day of the month preceding the month in which the death of the deceased shareholder occurred.

    b.  In the case of a purchase under paragraph 2 of this Agreement, the last day of the month preceding the month in which the Corporation received the notice of the proposed transfer as provided in paragraph 2.

    c.  In the case of a purchase under paragraph 3 of this Agreement, the last day of the month preceding the month in which the Corporation received actual notice of a transfer of Shares.

4.  Subject at all times to paragraph 6 of this Exhibit B, the term "Net Worth" shall be an amount equal to the amount of the Corporation's assets, less the amount of its liabilities, on the Valuation Date as determined by the Corporation's accountants in accordance with generally accepted accounting principles, prepared on the accrual basis, but adjusted as follows:

    a.  Insurance, if any, owned by the Corporation on the life of a deceased shareholder whose Shares are the subject of purchase under paragraph 1 of this Agreement shall be valued at its cash value on the Valuation Date and not its face value.

    b.  No adjustment shall be made on account of an event occurring subsequent to the Valuation Date, whether the event constitutes an adjustment to the Federal or State income tax liability of the Corporation or otherwise.

    c.  Reserves for contingent liabilities shall not be treated as liabilities.

    d.  No amount shall be included for goodwill.

7

e. There shall be added to the amount of depreciable assets, except assets described in paragraph (f) below, and there shall be deducted from the depreciation reserve with respect thereto the amount, if any, by which the depreciation reserve reflected on the Corporation's books of account exceeds the reserve calculated on a straight line basis.

f. Real estate and the improvements thereon, but excluding assets described in paragraph (e) above, shall be valued at fair market value on the Valuation Date and not valued as shown on the Corporation's books of account. The value of the real estate and improvements shall be determined by an appraiser appointed by the joint written direction of the selling and purchasing parties executed and delivered to the appraiser within ten days of the appointment of a personal representative for the deceased shareholder's estate or other event requiring sale. If for any reason no appraisal is made as above provided, the appraisal shall be made by an appraiser who shall be appointed by a Judge of the Probate Court having jurisdiction over such matters, upon proper application made thereto by any interested party. The appraisal shall be in writing and when made shall be filed with the Corporation's accountants for their use in determining the Corporation's Net Worth.

g. The Corporation's investment in wholly-owned subsidiaries shall be reflected at an amount equal to the Net Worth of the subsidiary determined in the same manner as herein provided for the determination of the Net Worth of the Corporation.

h. Securities owned by the Corporation which are listed on any public exchange or over-the-counter shall be valued on the Valuation Date, or if this was not a trading day, then on the last day immediately preceding the Valuation Date on which the securities were traded.

i. Merchandise inventory will be valued at historical cost regardless of the method used to value merchandise inventory for Federal income tax purposes.

j. Oil & Gas Producing Reserves and the associated Reserve for Depletion on the books of the Corporation shall be excluded from the calculation of Net Worth and their values shall be replaced as herein described: All Oil & Gas Properties, whether mineral interest, royalty interest, over-riding royalty interest, working interests, or any other connotation applied to oil and gas properties, shall be valued by substituting the net cash receipts for all properties during the twelve months preceding the Valuation Date. ("Net cash receipts" is defined as gross cash receipts less the operating expenses associated with joint interest billings on working interest properties and taxes withheld or billed directly to the Corporation for all properties, and less Supervision Consultants expenses. Any expenditure(s) made for drilling, equipping and completion of any new well(s) or any expenditures made to re-complete any producing zones in an existing

8

producing well(s), including intangible drilling costs, shall be considered as operating expenses and shall be a deduction in determining "net cash receipts".)

    k.   Any Oil & Gas Property that is not-producing shall be valued at an amount equal to the value recorded on the books of the Corporation.

5.   In the case of a purchase of Shares under paragraph 2 of the Agreement, if the price, if any, offered to the proposed transferee is less than the purchase price determined under paragraph 4 or 6 of this Exhibit B, that price rather than the price so determined shall be the price of Shares to be purchased under this Agreement.

6.   The Corporation's Net Worth, if determined as provided in paragraph 4 above, shall be determined by the firm of certified public accountants regularly employed by the Corporation. If the Corporation does not regularly employ a certified public accounting firm, the officers and or shareholders of the Corporation may calculate the Corporation's Net Worth as set out in this Agreement, and that calculation shall be presumed true, correct, and complete.

# EXHIBIT C

## INSTALLMENT PROMISSORY NOTE

_____, 19__

(THE CLOSING DATE)

FOR VALUE RECEIVED, the undersigned (insert name of guaranteeing shareholder) promises to pay, to the order of (the transferring shareholder, the transferee, or estate of the deceased shareholder) the principal sum of $_____ (deferred portion of the purchase price) with interest at the rate of _____% per annum from the date hereof on any principal sum balance from time to time unpaid. The principal sum of this Note shall be paid in ten (10) equal annual installments, the first installment to be payable at the end of one year from the date hereof and the remaining installments at the end of each succeeding year thereafter until the principal sum of this Note shall have been paid. Interest shall be paid at the same time as principal installments. Upon a default in payment of principal or interest continuing for 30 days after written notice then at the option of the holder all unpaid installments of principal and accrued interest due shall become immediately due and payable, and the holder shall be entitled to reimbursement for reasonable attorney's fees. At the option of the undersigned, all or any portion of this Note may be prepaid without premium or penalty, the amount of the prepayment to be applied first to accrued interest and the remainder to such unpaid principal installments as the undersigned shall designate in a written prepayment notice delivered to the holder of this note concurrently with the making of the prepayment, provided that no such prepayment can be made during the calendar year in which the note is executed.

(SIGNATURE OF PURCHASER)

*********************************

(Note: The following paragraph is to be inserted before the signature if the maker is a shareholder.)

The undersigned hereby transfers, pledges and delivers to (name of mutually agreeable and bonded Trustee) the following property as collateral security for the payment of this note.

(insert description of certificates which are to be pledged by the maker of the note)

And the undersigned hereby gives the payee, or the holder hereof, all rights granted to a secured party under the Uniform Commercial Code. So long as the undersigned is not in default in the payment of any sums due under this promissory note, the undersigned shall have the right to vote all certificates of stock pledged to the payee hereunder.

## EXHIBIT C-1

### GUARANTEE

The undersigned, (insert name of guaranteeing shareholder), does hereby guarantee payment when due by (insert name of the Corporation) of each installment of principal and interest due on its promissory note, dated (the closing date), which is payable to the order of (the transferring shareholder, the transferee, or estate of the deceased shareholder) in the principal sum of $_____ (deferred portion of the purchase price). Upon default by (insert name of the Corporation) to make any of the principal or interest payments due on said note for a period of 30 days or more, the undersigned agrees that the holder of said promissory note may, without seeking to collect any such due amounts from (insert name of the Corporation), demand and receive payment of all principal and interest due under the note from the undersigned.

The undersigned hereby transfers, pledges and delivers to (name of mutually agreeable and bonded Trustee) for the benefit of (the transferring shareholder, the transferee, or estate of the deceased shareholder) hereinafter referred to as "the Payee," the following property as collateral security for the discharge of the guarantee herein made:

(insert description of Shares which are to be purchased and pledged by the guarantor) and the undersigned hereby gives the Payee all rights of a secured party under the Uniform Commercial Code.

So long as (insert name of the Corporation) is not in default in the performance of its obligation under said promissory note, or so long as the undersigned is not in default in the performance of his obligations under this guarantee, the undersigned shall have the right to vote all certificates of stock pledged to the payee hereunder.

DATED (the closing date).

(guaranteeing shareholder)

11

## EXHIBIT D

### INSURANCE POLICIES ON THE LIVES OF THE SHAREHOLDERS

| NAME OF INSURED | POLICY NUMBER | NAME OF ISSUING COMPANY | FACE AMOUNT OF POLICY |
|---|---|---|---|
| _____ | _____ | _____ | $_____ |
| _____ | _____ | _____ | $_____ |
| _____ | _____ | _____ | $_____ |

12

# EXHIBIT E

HEROLD LAW, P.A.
Craig S. Provorny, Attorney Id. No. 021601986
25 Independence Boulevard
Warren, New Jersey 07059
(908) 647-1022 (Tel.)
(908) 647-7721 (Fax)
cprovorny@heroldlaw.com
Attorneys for Plaintiffs

|  | | SUPERIOR COURT OF NEW JERSEY |
|---|---|---|
|  | | CHANCERY DIVISION |
|  | | BERGEN COUNTY |
|  | | GENERAL EQUITY PART |
|  | | DOCKET NO. _____ |
| | : | Civil Action |
| STIFEL TRUST COMPANY, N.A., EXECUTOR OF THE ESTATE OF ERICK DEVINE and STIFEL TRUST COMPANY, N.A., TRUSTEE OF THE ERICK DEVINE REVOCABLE TRUST, Plaintiffs | : | |
| v. | : | CERTIFICATION OF |
| THE ACTORS FUND OF AMERICA, THE POINT FOUNDATION, WAYNE STATE UNIVERSITY, THE SANDY FUND, MICHAEL COLLINS, JEFFREY DAVAULT, VERN STEFANIC, JAMES YOUNG, JAMES WILLISTON, PATTY METZ, WENDY LYNN WILLIAMS, and SEAN ROSENZWEIG, Defendants | : : | J. DENNIS DEVINE |

J. DENNIS DEVINE, of full age, does hereby certify as follows:

1.      This Certification is submitted in connection with the redemption of the shares of stock owned by the Erick Devine Revocable Trust dated August 16, 1995 (the "Trust") in King Properties, Inc. ("King") and Fisher Enterprises, Inc. ("Fisher").

2.      Upon the death of Erick Devine, King became entitled to redeem all of the shares held by the Trust in King.

3.      On behalf of King I timely exercised the right of King to redeem the said shares.

4.      Upon the death of Erick Devine, Fisher became entitled to redeem all of the shares held by the Trust in Fisher.

5.      On behalf of Fisher I timely exercised the right of Fisher to redeem the said shares.

6.      I am authorized to act on behalf of Fisher and to perform all acts in connection with the redemption of the shares.

7.      The redemption of the shares of Fisher does not violate any law or agreement to which Fisher is a party or by which it is bound.

8.      I am authorized to act on behalf of King and to perform all acts in connection with the redemption of the shares.

9.      The redemption of the shares of King does not violate any law or agreement to which King is a party or by which it is bound.

10.     The valuation of the Fisher shares was prepared in accordance with Exhibit B of the Stock Purchase Agreement for Fisher dated January 12, 1999, as amended November 25, 2016 and is based upon the Balance Sheet for Fisher dated as of March 31, 2019 ("Fisher Balance Sheet"). A copy of the valuation is attached hereto as **Exhibit E.**

11.     The information set forth in the Fisher Balance Sheet reflects all assets of Fisher, accurately reflects all liabilities of Fisher and does not fail to include any information that is material to Fisher.

12.     The valuation of the King shares was prepared in accordance with Exhibit B of the Stock Purchase Agreement for King dated January 12, 1999, as amended November 25, 2016 and

- 2 -

is based upon the Balance Sheet for King dated as of March 31, 2019 ("King Balance Sheet"). *See* Exhibit E.

      13.    The information set forth in the King Balance Sheet reflects all assets of King, accurately reflects all liabilities of King and does not fail to include any information that is material to King.

I hereby certify that the foregoing statements made by me are true.  I am aware if any of the foregoing statements made by me are willfully false I would be subject to punishment.

J. Dennis Devine

DATED: July 2 4, 2020

—4—

## CERTIFICATION OF FACSIMILE SIGNATURE

This Certification, filed pursuant to Rule 1:4-4(c), acknowledges the genuineness of the fax signature of J. Dennis Devine on his Certification with regard to the above-referenced matter. A copy of the original page bearing his signature will be supplied if requested by the Court or a party to this action.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


/s/ Craig S. Provorny
Craig S. Provorny

DATED:  July 27, 2020

EXHIBIT E

## J. Dennis Devine

P.O. Box 1147
Heber Springs, AR 72543

501-250-5542
Fax 501-362-1296
jddevine1952@yahoo.com

October 8, 2019

Nicolas Forte, Trust Officer
Stifel Trust Company, N.A.
501 N. Broadway
St. Louis, MO 63102

Via email to forten@stifeltrust.com

Joseph M. Lemond
Herold Law
25 Independence Boulevard
Warren, New Jersey 07059-6747

Via email to jlemond@heroldlaw.com

Re:   Estate of Erick Devine
      Redemption of closely-held common stock
         King Properties, Inc.
         Fisher Enterprises, Inc.

Gentlemen:

I apologize for not sending this information before now. I have reasons, but no excuses.

As a quick background to King and Fisher, both are closely-held, Oklahoma corporations. King owns minority interests primarily in oil and gas <u>royalty</u> properties, and Fisher owns minority interests primarily in oil and gas <u>operating interest</u> properties. Neither corporation performs work on the actual properties. They only share in the revenues and expenses. Each corporation has an identical stock repurchase agreement in effect, which was adopted on January 12, 1999, and partially modified on November 25, 2016.

We originally had a third investor, Donald W. Stephens, who died on February 19, 2016. When Don was diagnosed with pancreatic cancer in 2015, we distributed undivided, one-third interests in all properties owned by King to Don in exchange for his common stock. In March of 2016, Erick and I exercised the right of Fisher to redeem Don's common stock pursuant to the stock repurchase agreement. On November 25, 2016, Erick and I amended Exhibit B Determination of the Purchase Price of the stock repurchase agreements for both King and Fisher, because we believed the original formula overstated the value of the stock we had to purchase from Don's estate. The economics of the oil and gas industry changed drastically from 1999 to 2016. We both believed the amended formula was more equitable.

On behalf of both corporations, I exercised the right of the corporations to redeem Erick's stock according to Exhibit B of the agreement. I am attaching copies of documents and schedules pertaining to redeeming Erick's stock as follows:

Page 1 of 2

1.  Exhibit B Determination of the Purchase Price as amended November 25, 2016
2.  Preliminary Valuation of Fisher Enterprises, Inc. as of March 31, 2019
3.  Balance sheet of Fisher Enterprises, Inc. as of March 31, 2019
4.  Profit & Loss of Fisher Enterprises, Inc. for the twelve months ended March 31, 2019
5.  Preliminary Valuation of King Properties, Inc. as of March 31, 2019
6.  Balance sheet of King Properties, Inc. as of March 31, 2019
7.  Profit & Loss of King Properties, Inc. for the twelve months ended March 31, 2019
8.  Copy of Rev. Rul. 2019-14 Table 1 Applicable Federal Rates for June 2019
9.  Amortization Schedule, King Properties, Inc. to Trustee of the Erick Devine Trust

I first ran the preliminary valuations of the two corporations in late June, 2019. Due to a lot of circumstances beyond my control and other lame excuses, I did not review the calculations after that. I am sending them to you in the form I left them back in June. I have a few concerns, which I think we probably need to come to some agreement on.

a)  My calculation of Fisher's value is negative. I neither intended nor anticipated that kind of result. I don't think Erick did either. The cash flow in Fisher for the twelve months ended March 31, 2019, was not good, and the valuation according to Exhibit B suffered accordingly. If we substitute total stockholder's equity for the Exhibit B formula, Erick's share would be worth $4,285.23. I am open to suggestions on a fair way to handle this situation.

b)  My calculation of Erick's share of King is $208,314.70. Under the agreement, a down payment of $41,662.94 is due to Erick's trust, and $166,651.76 is due to his trust in the form of a ten-year, interest bearing, installment note payable. I prepared an amortization schedule based on an annuity of 120 monthly payments at 2.36% APR. I selected the interest rate based on the Rev. Rul. above. The redemption and date of the note, according to the terms of the repurchase agreement, should have occurred on June 15, 2019. However, we were still trying to resolve the distribution of proceeds from the Oklahoma lawsuit on June 15th. I feel we should provide for interest from King to Erick's trust on the full redemption price from June 15th to the date we actually execute the redemption. Again, I am open to your thoughts on how to move forward.

Please let me know what additional information you need at this time. I am sending the documents listed above, because I believe they are the most relevant. Also, as a veteran of numerous "drown them in paper" engagements, I'm trying to save you having to sort through endless pages of useless, superfluous data. I will be happy to provide copies of the complete stock repurchase agreements for both corporations, and whatever additional accounting information you need.

Kindest personal regards,

J. Dennis Devine

As Amended November 25, 2016
EXHIBIT B
Determination of the Purchase Price

1.  The price of Shares to be purchased under this Agreement shall be their Fair Market Value on the Valuation Date.

2.  The term "Fair Market Value" as used in paragraph 1 of this Exhibit B shall be an amount which bears the same proportion to the Net Worth (as defined below) of the Corporation as the number of Shares to be purchased bears to the total number of the Corporation's Shares outstanding on the Valuation Date.

3.  The "Valuation Date", as used herein, shall be:

    a.  In the case of a purchase under paragraph 1 of this Agreement, the last day of the month preceding the month in which the death of the deceased shareholder occurred.

    b.  In the case of a purchase under paragraph 2 of this Agreement, the last day of the month preceding the month in which the Corporation received the notice of the proposed transfer as provided in paragraph 2.

    c.  In the case of a purchase under paragraph 3 of this Agreement, the last day of the month preceding the month in which the Corporation received actual notice of a transfer of Shares.

4.  Subject at all times to paragraph 6 of this Exhibit B, the term "Net Worth" shall be an amount equal to the amount of the Corporation's assets, less the amount of its liabilities, on the Valuation Date as determined by the Corporation's accountants in accordance with generally accepted accounting principles, prepared on the accrual basis, but adjusted as follows:

    a.  Insurance, if any, owned by the Corporation on the life of a deceased shareholder whose Shares are the subject of purchase under paragraph 1 of this Agreement shall be valued at its cash value on the Valuation Date and not its face value.

    b.  No adjustment shall be made on account of an event occurring subsequent to the Valuation Date, whether the event constitutes an adjustment to the Federal or State income tax liability of the Corporation or otherwise.

    c.  Reserves for contingent liabilities shall not be treated as liabilities.

    d.  No amount shall be included for goodwill.

    e.  There shall be added to the amount of depreciable assets, except assets described in paragraph (f) below, and there shall be deducted from the depreciation reserve with respect thereto the amount, if any, by which the depreciation reserve reflected on the Corporation's books of account exceeds the reserve calculated on a straight line basis.

1/3

f.   Real estate and the improvements thereon, but excluding assets described in paragraph (e) above, shall be valued at fair market value on the Valuation Date and not valued as shown on the Corporation's books of account. The value of the real estate and improvements shall be determined by an appraiser appointed by the joint written direction of the selling and purchasing parties executed and delivered to the appraiser within ten days of the appointment of a personal representative for the deceased shareholder's estate or other event requiring sale. If for any reason no appraisal is made as above provided, the appraisal shall  be made by an appraiser who shall be appointed by a Judge of the Probate Court having jurisdiction over such matters, upon proper application made thereto by any interested party., The appraisal shall be in writing and when made shall  be filed with the Corporation's accountants for their use in determining the Corporation's Net Worth.

g.   The Corporation's investment in wholly-owned subsidiaries shall be reflected at an amount equal to the Net Worth of the subsidiary determined in the same manner as herein provided for the determination of the Net Worth of the Corporation.

h.   Securities owned by the Corporation which are listed on any public exchange or over-the-counter shall be valued on the Valuation Date, or if this was not a trading day, then on the last day immediately preceding the Valuation Date on which the securities were traded.

i.   Merchandise inventory will be valued at historical cost regardless of the method used to value merchandise inventory for Federal income tax purposes.

j.   Oil & Gas Producing Reserves and the associated Reserve for Depletion on the books of the Corporation shall be excluded from the calculation of Net Worth and their values shall be replaced as herein described: All Oil & Gas Properties, whether mineral interest, royalty interest, over-riding royalty interest, working interests, or any other connotation applied to oil and gas properties, shall be valued by substituting the net cash receipts for all properties during the twelve months preceding the Valuation Date. ("Net cash receipts" is defined as gross cash receipts less the operating expenses associated with joint interest billings on working interest properties and taxes withheld or billed directly to the Corporation for all properties, and less Supervision Consultants expenses. Any expenditure(s) made for drilling, equipping and completion of any new well(s) or any expenditures made to re-complete any producing zones in an existing producing well(s), including intangible drilling costs, shall be considered as operating expenses and shall be a deduction in determining "net cash receipts".)

k.   Any Oil & Gas Property that is not-producing shall be valued at an amount equal to the value recorded on the books of the Corporation.

2/3

5.   In the case of a purchase of Shares under paragraph 2 of the Agreement, if the price, if any, offered to the proposed transferee is less than the purchase price determined under paragraph 4 or 6 of this Exhibit B, that price rather than the price so determined shall be the price of Shares to be purchased under this Agreement.

6.   The Corporation's Net Worth, if determined as provided in paragraph 4 above, shall be determined by the firm of certified public accountants regularly employed by the Corporation. If the Corporation does not regularly employ a certified public accounting firm, the officers and or shareholders of the Corporation may calculate the Corporation's Net Worth as set out in this Agreement, and that calculation shall be presumed true, correct, and complete.

3/3

PRELIMINARY DRAFT - FOR DISCUSSION PURPOSES ONLY

Valuation of Fisher Enterprises, Inc.
Per Stock Purchase Agreement as amended November 25, 2016
March 31 2019

JDD
6/27/2019

EXHIBIT B

Paragraph 4.

Cash basis per Quickbooks:

Total assets
Less: Liabilities
Add: Accounts receivable    $ 81,471.15
Less: Accounts payable    72,900.69
   0.00

Net worth - accrual basis    $ 8,570.46

Paragraph 4(a) Life insurance
Paragraph 4(b) Events after valuation date    0.00
Paragraph 4(c) Contingent liabilities    0.00
Paragraph 4(d) Goodwill    0.00
Paragraph 4(e) Excess depreciation over Straight Line    0.00

A/C 1410 - Tangible oil & gas well equipment    624,139.24
A/C 1420 - Accumulated depreciation - tax basis    -624,139.24
Net book value of equipment - tax basis    0.00

| | Additions | Actual Sec 179 | Accumulated Depreciation (*) SL 7 1/2 YR Conv | Excess Over Strt Line 7 | SOURCE |
|---|---|---|---|---|---|
| Balance 12-31-2008 | 468,630.69 | 468,630.69 | 468,630.69 | | |
| 2009 Additions | 29,782.30 | 29,782.30 | 29,782.30 | 0.00 | FH2009DEPR.XLS Cell K120 |
| 2010 Additions | 12,950.67 | 12,950.67 | 12,950.67 | 0.00 | FH2010DEPR.XLS Cell K121 |
| 2011 Additions | 59,183.81 | 59,183.81 | 59,183.81 | 0.00 | FH2011DEPR.XLS Cell K183 |
| 2012 Additions | 26,071.59 | 26,071.59 | 26,071.59 | 0.00 | FH2012DEPR.XLS, Cell K115 |
| 2013 Additions | 0.00 | 0.00 | 0.00 | 0.00 | FH2013DEPR.XLS, Cell K115 |
| 2014 Additions | 27,520.18 | 27,520.18 | 21,623.00 | 5,897.18 | FH2014 DEPR.XLS, Cell K188 |
| 2015 Additions | 0.00 | 0.00 | 0.00 | 0.00 | Analysis of QB Account 1410 |
| 2016 Additions | 0.00 | 0.00 | 0.00 | | Analysis of QB Account 1410 |
| 2017 Additions | 0.00 | 0.00 | 0.00 | | Analysis of QB Account 1410 |
| 2018 Additions | 0.00 | 0.00 | 0.00 | | Analysis of QB Account 1410 |
| 2019 Additions | 0.00 | 0.00 | 0.00 | | Analysis of QB Account 1410 |
| | 624,139.24 | 624,139.24 | 618,242.06 | 5,897.18 | |

Excess depreciation over Straight Line    5,897.18

( * ) Acculated Depreciation at 3/31/2019 assuming straight-line w/ half year convention.

PRELIMINARY DRAFT - FOR DISCUSSION PURPOSES ONLY

Valuation of Fisher Enterprises, Inc.
Per Stock Purchase Agreement as amended November 25, 2016
March 31 2019

JDD
6/27/2019

| | | | |
|---|---|---|---|
| Paragraph 4(f) Real estate FMV adjustment | | 0.00 | |
| Paragraph 4(g) Investments in subsidiaries | | 0.00 | |
| Paragraph 4(h) Publicly-traded securities | | 0.00 | |
| Paragraph 4(i) Merchandise inventory adjustment | | 0.00 | |
| | | | |
| Paragraph 4(j): Oil and Gas Properties | | | |
| Net Oil and Gas Properties | -27,327.93 | | |
| Net cash receipts/deficit Fiscal Year Ended March 31, 2019 | -10,439.66 | -37,767.59 | |
| | | | |
| Paragraph 4(k) Non-producing oil & gas properties | | 0.00 | |
| | | | |
| Total value as determined by Stock Purchase Agreement | | $ (23,299.95) | |
| | | | |
| Erick Devine share of value (1/2) | | $ (11,649.97) | |
| | | | |
| Minimum cash down payment per Paragraph 7(a) - 20% | $ (2,329.99) | | |
| | | | |
| Promissory note - 80% per Paragraph 7(b) | $ (9,319.98) | $ (11,649.97) | |
| | | | |
| Fisher    Total assets | 81,471.15 | | QB Balance Sheet 3-31-2019 |
| Fisher    Total liabilities | 72,900.69 | | QB Balance Sheet 3-31-2019 |
| Fisher    Total stockholders' equity | | 8,570.46 | QB Balance Sheet 3-31-2019 |
| | | | |
| 50% of stockholders' equity | | 4,285.23 | |

QuickBooks Acct 1431

1:27 PM
06/27/19
Cash Basis

**Fisher Enterprises, Inc.**
**Balance Sheet**
As of March 31, 2019

|  | Mar 31, 19 |
|---|---|
| **ASSETS** | |
| Current Assets | |
| Checking/Savings | |
| 1100 · Bank | |
| 1101 · Checking Acct-Citizens Security | -15,297.69 |
| 1102 · Money Market--Citizens Security | 69,440.91 |
| Total 1100 · Bank | 54,143.22 |
| Total Checking/Savings | 54,143.22 |
| Total Current Assets | 54,143.22 |
| Fixed Assets | |
| 1400 · Fixed Assets | |
| 1410 · Tangible oil & gas well equip | |
| 1420 · Accumulated Depreciation | 624,139.24 |
| 1421 · A/D-tangible O&G well equip | -624,139.24 |
| Total 1420 · Accumulated Depreciation | -624,139.24 |
| Total 1400 · Fixed Assets | 0.00 |
| Total Fixed Assets | 0.00 |
| Other Assets | |
| 1430 · Other Assets | |
| 1431 · Oil & gas properties | |
| 1433 · Producing reserves | |
| 1434 · Oil & gas-accum depletion | |
| 1435 · O&G-AcDepl (Tax in excess Book) | 1,045,976.55 |
| 1434 · Oil & gas-accum depletion - Other | -1,352,716.55 |
| Total 1434 · Oil & gas-accum depletion | -306,740.00 |
| 1433 · Producing reserves - Other | 334,067.93 |
| Total 1433 · Producing reserves | 27,327.93 |
| Total 1431 · Oil & gas properties | 27,327.93 |
| Total 1430 · Other Assets | 27,327.93 |
| Total Other Assets | 27,327.93 |
| **TOTAL ASSETS** | 81,471.15 |
| **LIABILITIES & EQUITY** | |
| Liabilities | |
| Long Term Liabilities | |
| 2300 · Loan Payable-Stephens Trust | 72,900.69 |
| Total Long Term Liabilities | 72,900.69 |
| Total Liabilities | 72,900.69 |
| Equity | |
| 3330 · Capital Stock | 1,000.00 |
| 3340 · Paid-in or Capital Surplus | |
| 3343 · Dennis Devine | 150,000.00 |
| 3344 · C. Erick Devine | 150,000.00 |
| 3345 · Donald W. Stephens | 150,000.00 |
| Total 3340 · Paid-in or Capital Surplus | 450,000.00 |

Page 1

1:27 PM

06/27/19

Cash Basis

**Fisher Enterprises, Inc.**
**Balance Sheet**
As of March 31, 2019

|  | Mar 31, 19 |
|---|---|
| 3900 · Retained Earnings | -179,039.60 |
| 3910 · Treasury Stock | -250,000.00 |
| Net Income | -13,389.94 |
| **Total Equity** | 8,570.46 ✓ |
| **TOTAL LIABILITIES & EQUITY** | 81,471.15 |

Page 2 /2

1:27 PM
06/27/19
Cash Basis

# Fisher Enterprises, Inc.
## Profit & Loss
### April 2018 through March 2019

|  | Apr '18 - Mar 19 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| **4020 · Sales** | |
| **4021 · Oil & gas interests** | |
| 4023 · Oil & gas revenue | 92,686.53 |
| **Total 4021 · Oil & gas interests** | 92,686.53 |
| **Total 4020 · Sales** | 92,686.53 |
| **Total Income** | 92,686.53 |
| **Cost of Goods Sold** | |
| **5000 · Operating expenses** | |
| **5560 · Oil & gas expenses** | |
| 5561 · Ad valorem tax | 30.25 |
| 5565 · Operating expenses-other | 64,453.11 |
| 5560 · Oil & gas expenses - Other | 807.08 |
| **Total 5560 · Oil & gas expenses** | 65,290.44 |
| **5600 · Supervision Fees--Okla. Oper.** | |
| 5655 · Consultants | 34,800.00 |
| **Total 5600 · Supervision Fees--Okla. Oper.** | 34,800.00 |
| **Total 5000 · Operating expenses** | 100,090.44 |
| **Total COGS** | 100,090.44 |
| **Gross Profit** | -7,403.91 |
| **Expense** | |
| **6440 · Interest Expense** | |
| 6460 · Loan Interest | 3,308.94 |
| **Total 6440 · Interest Expense** | 3,308.94 |
| **Total Expense** | 3,308.94 |
| **Net Ordinary Income** | -10,712.85 |
| **Other Income/Expense** | |
| **Other Income** | |
| **8030 · Other Income** | |
| 8060 · Interest Income | 273.19 |
| **Total 8030 · Other Income** | 273.19 |
| **Total Other Income** | 273.19 |
| **Net Other Income** | 273.19 |
| **Net Income** | -10,439.66 |

Page 1

PRELIMINARY DRAFT - FOR DISCUSSION PURPOSES ONLY

Valuation of King Properties, Inc.

Per Stock Purchase Agreement as amended November 25, 2016

March 31 2019

JDD
6/27/2019

EXHIBIT B

Paragraph 4.

Cash basis per Quickbooks:

| | |
|---|---|
| Total assets | |
| Less: Liabilities | |
| Add: Accounts receivable | 107,158.14 |
| Less: Accounts payable | 0.00 |
| | 0.00 |
| Net worth - accrual basis | 107,158.14 |

| | |
|---|---|
| Paragraph 4(a) Life insurance | |
| Paragraph 4(b) Events after valuation date | 0.00 |
| Paragraph 4 (c) Contingent liabilities | 0.00 |
| Paragraph 4(d) Goodwill | 0.00 |
| Paragraph 4(e). Excess depreciation over Straight Line | 0.00 |

| | | |
|---|---|---|
| 1410 - Tangible oil & gas well equipment | 990.16 | |
| 1414 - Computers & Printers | 1,794.39 | |
| 1415 - Office Building Assets | 4,785.60 | |
| Total depreciable assets | | 7,570.15 |
| 1421 - Accum Depreciation O&G well equipment | 990.16 | |
| 1424 - Accum Depreciation Computers & Printers | 1,794.39 | |
| 1425 - Accum Depreciation Office Building Assets | 4,785.60 | |
| 1420 - Accumulated depreciation | | 7,570.15 |
| Net book value of equipment - tax basis | | 0.00 |

Net book value of equipment - assume Straight Line/7 years, mid-term convention

| Cost: | A/C 1410 | A/C 1414 | A/C 1415 | Total |
|---|---|---|---|---|
| Balance 12-31-2008 | 1,485.24 | 1,859.91 | | 3,345.15 |
| 2009 Net Additions | | -883.52 | | -883.52 |
| 2010 Net Additions | | | | 0.00 |
| 2011 Net Additions | | 818.00 | 4,785.60 | 5,603.60 |
| 2012 Net Additions | | | | 0.00 |
| 2013 Net Additions | | | | 0.00 |
| 2014 Net Additions | | | | 0.00 |
| 2015 Net Additions | -495.08 | | | -495.08 |
| 2016 Net Additions | | | | 0.00 |
| 2017 Net Additions | | | | 0.00 |
| 2018 Net Additions | | | | 0.00 |
| 2019 Net Additions | | | | 0.00 |
| | 990.16 | 1,794.39 | 4,785.60 | 7,570.15 |

Case 2:21-cv-20394-CCC-JBC   Document 1-1   Filed 12/07/21   Page 77 of 95 PageID: 81

PRELIMINARY DRAFT - FOR DISCUSSION PURPOSES ONLY

Valuation of King Properties, Inc.
Per Stock Purchase Agreement as amended November 25, 2016
March 31 2019

JDD
6/27/2019

Accum Depreciation
Straight Line 7 years w/ half-year convention

| | A/C 1421 | A/C 1424 | A/C 1425 | Total |
|---|---|---|---|---|
| Balance 12-31-2008 | 1,485.24 | 1,859.91 | 0.00 | 3,345.15 |
| 2009 Net Additions | 0.00 | -883.52 | 0.00 | -883.52 |
| 2010 Net Additions | 0.00 | 0.00 | 0.00 | 0.00 |
| 2011 Net Additions | 0.00 | 818.00 | 4,785.60 | 5,603.60 |
| 2012 Net Additions | 0.00 | 0.00 | 0.00 | 0.00 |
| 2013 Net Additions | 0.00 | 0.00 | 0.00 | 0.00 |
| 2014 Net Additions | 0.00 | 0.00 | 0.00 | 0.00 |
| 2015 Net Additions | -495.08 | 0.00 | 0.00 | -495.08 |
| 2016 Net Additions | 0.00 | 0.00 | 0.00 | 0.00 |
| 2017 Net Additions | 0.00 | 0.00 | 0.00 | 0.00 |
| 2018 Net Additions | 0.00 | 0.00 | 0.00 | 0.00 |
| 2019 Net Additions | 0.00 | 0.00 | 0.00 | 0.00 |
| | 990.16 | 1,794.39 | 4,785.60 | 7,570.15 |

Excess depreciation over Straight Line                                         0.00

Paragraph 4(f) Real estate FMV adjustment                                      0.00
Paragraph 4(g) Investments in subsidiaries                                     0.00
Paragraph 4(h) Publicly-traded securities                                      0.00
Paragraph 4(i) Merchandise inventory adjustment                                0.00

Paragraph 4(j) Oil and Gas Properties
    Less: Net Oil and Gas Properties per books                          -3,297.22
    Add: Net oil & gas revenue Fiscal Year Ended March 31, 2019          202,313.11
    Net adjusted value of producing properties at 3-31-2019                          199,015.89

Paragraph 4(k) Book value of non-producing oil & gas properties at 3/31/2019          3,297.22

Total value of corporation as determined by Stock Purchase Agreement                 416,629.39

Erick Devine share of value (1/2)                                                    208,314.70

Cash down payment per Paragraph 7(a) - 20%                                            41,662.94

Promissory note - 80% per Paragraph 7(b)                                             166,651.76

King cash balance @ March 31, 2019                                                   103,860.92

QB Balance Sheet 3-31-2019

2/2

2:53 PM
06/27/19
Cash Basis

# King Properties, Inc.
## Balance Sheet
### As of March 31, 2019

|  | Mar 31, 19 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| **1100 · Bank** | |
| 1101 · Checking Acct-Citizens Security | 29,447.37 |
| 1102 · Money Market--Citizens Security | 74,413.55 |
| **Total 1100 · Bank** | 103,860.92 |
| **Total Checking/Savings** | 103,860.92 |
| **Total Current Assets** | 103,860.92 |
| **Fixed Assets** | |
| **1400 · Fixed Assets** | |
| 1410 · Tangible oil & gas well equip | 990.16 |
| 1414 · Computers & Printers | 1,794.39 |
| 1415 · Office Building Assets | 4,785.60 |
| **1420 · Accumulated Depreciation** | |
| 1421 · A/D-tangible O&G well equip | -990.16 |
| 1424 · A/D-Computers & Printers | -1,794.39 |
| 1425 · A/D-Office Bldg. Assets | -4,785.60 |
| **Total 1420 · Accumulated Depreciation** | -7,570.15 |
| **Total 1400 · Fixed Assets** | -0.00 |
| **Total Fixed Assets** | 0.00 |
| **Other Assets** | |
| **1430 · Other Assets** | |
| **1431 · Oil & gas properties** | |
| 1432 · Non-producing properties | 3,297.22 |
| **1433 · Producing reserves** | |
| **1434 · Oil & gas-accum depletion** | |
| 1435 · O&G-AcDepl(Tax in excess Book) | 544,768.57 |
| 1434 · Oil & gas-accum depletion - Other | -695,861.26 |
| **Total 1434 · Oil & gas-accum depletion** | -151,092.69 |
| 1433 · Producing reserves - Other | 151,092.69 |
| **Total 1433 · Producing reserves** | 0.00 |
| **Total 1431 · Oil & gas properties** | 3,297.22 |
| **Total 1430 · Other Assets** | 3,297.22 |
| **Total Other Assets** | 3,297.22 |
| **TOTAL ASSETS** | 107,158.14 |
| **LIABILITIES & EQUITY** | |
| **Equity** | |
| 3330 · Capital Stock | 666.67 |
| **3340 · Paid-in or Capital Surplus** | |
| 3343 · Dennis Devine | 21,508.96 |
| 3344 · C. Erick Devine | 21,508.97 |
| **Total 3340 · Paid-in or Capital Surplus** | 43,017.93 |
| 3900 · Retained Earnings | 3,301,548.98 |
| 3901 · RetEarn(Book in Ex. Tax)Contra | 547,438.13 |
| **3920 · Distributions** | |
| 3943 · James Dennis Devine | -1,924,312.50 |
| 3944 · Erick Devine | -1,924,312.50 |
| **Total 3920 · Distributions** | -3,848,625.00 |

2:53 PM
06/27/19
Cash Basis

# King Properties, Inc.
## Balance Sheet
### As of March 31, 2019

|  | Mar 31, 19 |
|---|---|
| Net Income |  |
| Total Equity | 63,111.43 |
| TOTAL LIABILITIES & EQUITY | 107,158.14 |
|  | 107,158.14 |

2:52 PM
06/27/19
Cash Basis

# King Properties, Inc.
## Profit & Loss
### April 2018 through March 2019

|  | Apr '18 - Mar 19 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| **4020 · Sales** | |
| **4021 · Oil & gas interests** | |
| 4022 · Lease bonus income | 293.50 |
| 4023 · Oil & gas revenue | 228,078.21 |
| Total 4021 · Oil & gas interests | 228,371.71 |
| 4030 · Refunds & adjustments | 1,321.71 |
| Total 4020 · Sales | 229,693.42 |
| **Total Income** | 229,693.42 |
| **Cost of Goods Sold** | |
| **5000 · Operating expenses** | |
| **5560 · Oil & gas expenses** | |
| 5561 · Ad valorem tax | 399.46 |
| 5565 · Operating expenses-other | 3,909.02 |
| Total 5560 · Oil & gas expenses | 4,308.48 |
| **5600 · Supervision Fees--Okla. Oper.** | |
| 5655 · Consultants | 19,333.30 |
| Total 5600 · Supervision Fees--Okla. Oper. | 19,333.30 |
| Total 5000 · Operating expenses | 23,641.78 |
| **Total COGS** | 23,641.78 |
| **Gross Profit** | 206,051.64 |
| **Expense** | |
| 6175 · Contributions | 158.69 |
| 6220 · Dues and Subs/chg. to 6525 | 495.00 |
| 6610 · Postage | 286.00 |
| 6760 · Safety Dep Box Rent | 35.00 |
| 6780 · Security | 180.00 |
| **6880 · Telephone** | |
| 6881 · Main Line | 651.44 |
| 6883 · Internet Hookup | 536.21 |
| 6884 · Cellular Phone | 861.70 |
| Total 6880 · Telephone | 2,049.35 |
| **6940 · Utilities** | |
| 6945 · Electric | 321.29 |
| 6950 · Gas | 182.07 |
| 6960 · Water | 31.13 |
| Total 6940 · Utilities | 534.49 |
| **Total Expense** | 3,738.53 |
| **Net Ordinary Income** | 202,313.11 |
| **Other Income/Expense** | |
| **Other Income** | |
| **8030 · Other Income** | |
| 8060 · Interest Income | 208.99 |
| Total 8030 · Other Income | 208.99 |
| Total Other Income | 208.99 |
| **Net Other Income** | 208.99 |
| **Net Income** | 202,522.10 |

Page 1 / l

2

### REV. RUL. 2019-14 TABLE 1

### Applicable Federal Rates (AFR) for June 2019

| | Annual | Period for Compounding | | Monthly |
| | | Semiannual | Quarterly | |
|---|---|---|---|---|
| **Short-term** | | | | |
| AFR | 2.37% | 2.36% | 2.35% | 2.35% |
| 110% AFR | 2.62% | 2.60% | 2.59% | 2.59% |
| 120% AFR | 2.85% | 2.83% | 2.82% | 2.81% |
| 130% AFR | 3.09% | 3.07% | 3.06% | 3.05% |
| **Mid-term** | | | | |
| AFR | 2.38% | 2.37% | 2.36% | 2.36% |
| 110% AFR | 2.63% | 2.61% | 2.60% | 2.60% |
| 120% AFR | 2.86% | 2.84% | 2.83% | 2.82% |
| 130% AFR | 3.10% | 3.08% | 3.07% | 3.06% |
| 150% AFR | 3.59% | 3.56% | 3.54% | 3.53% |
| 175% AFR | 4.19% | 4.15% | 4.13% | 4.11% |
| **Long-term** | | | | |
| AFR | 2.76% | 2.74% | 2.73% | 2.72% |
| 110% AFR | 3.03% | 3.01% | 3.00% | 2.99% |
| 120% AFR | 3.32% | 3.29% | 3.28% | 3.27% |
| 130% AFR | 3.59% | 3.56% | 3.54% | 3.53% |

## AMORTIZATION SCHEDULE
Payer - King Properties, Inc.
Payee - Trustee of the Erick Devine Revocable Trust dated August 16, 1995

| Date of Note | Principal Amount | Annual Percentage Rate | Monthly Interest Rate |
|---|---|---|---|
| June 17, 2019 | $ 166,651.76 | 2.36% | 2.75%/12 |

| Payment Date | Pmt # | Pmt $ | Interest | Principal | Balance | FYE | Annual Totals Pmt $ | Annual Totals 1099-INT Interest | Annual Totals Principal |
|---|---|---|---|---|---|---|---|---|---|
| June 15 2019 | xxx | xxx | xxx | xxx | 166,651.76 | | | | |
| July 15 2019 | 1 | 1,560.44 | 327.75 | 1,232.69 | 165,419.07 | | | | |
| August 15 2019 | 2 | 1,560.44 | 325.32 | 1,235.12 | 164,183.95 | | | | |
| September 15 2019 | 3 | 1,560.44 | 322.90 | 1,237.54 | 162,946.41 | | | | |
| October 15 2019 | 4 | 1,560.44 | 320.46 | 1,239.98 | 161,706.43 | | | | |
| November 15 2019 | 5 | 1,560.44 | 318.02 | 1,242.42 | 160,464.01 | | | | |
| December 15 2019 | 6 | 1,560.44 | 315.58 | 1,244.86 | 159,219.15 | 2019 | 9,362.64 | 1,930.03 | 7,432.61 |
| January 15 2020 | 7 | 1,560.44 | 313.13 | 1,247.31 | 157,971.84 | | | | |
| February 15 2020 | 8 | 1,560.44 | 310.68 | 1,249.76 | 156,722.08 | | | | |
| March 15 2020 | 9 | 1,560.44 | 308.22 | 1,252.22 | 155,469.86 | | | | |
| April 15 2020 | 10 | 1,560.44 | 305.76 | 1,254.68 | 154,215.18 | | | | |
| May 15 2020 | 11 | 1,560.44 | 303.29 | 1,257.15 | 152,958.03 | | | | |
| June 15 2020 | 12 | 1,560.44 | 300.82 | 1,259.62 | 151,698.40 | | | | |
| July 15 2020 | 13 | 1,560.44 | 298.34 | 1,262.10 | 150,436.30 | | | | |
| August 15 2020 | 14 | 1,560.44 | 295.86 | 1,264.58 | 149,171.72 | | | | |
| September 15 2020 | 15 | 1,560.44 | 293.37 | 1,267.07 | 147,904.65 | | | | |
| October 15 2020 | 16 | 1,560.44 | 290.88 | 1,269.56 | 146,635.09 | | | | |
| November 15 2020 | 17 | 1,560.44 | 288.38 | 1,272.06 | 145,363.04 | | | | |
| December 15 2020 | 18 | 1,560.44 | 285.88 | 1,274.56 | 144,088.48 | 2020 | 18,725.28 | 3,594.61 | 15,130.67 |
| January 15 2021 | 19 | 1,560.44 | 283.37 | 1,277.07 | 142,811.41 | | | | |
| February 15 2021 | 20 | 1,560.44 | 280.86 | 1,279.58 | 141,531.83 | | | | |
| March 15 2021 | 21 | 1,560.44 | 278.35 | 1,282.09 | 140,249.74 | | | | |
| April 15 2021 | 22 | 1,560.44 | 275.82 | 1,284.62 | 138,965.12 | | | | |
| May 15 2021 | 23 | 1,560.44 | 273.30 | 1,287.14 | 137,677.98 | | | | |
| June 15 2021 | 24 | 1,560.44 | 270.77 | 1,289.67 | 136,388.31 | | | | |
| July 15 2021 | 25 | 1,560.44 | 268.23 | 1,292.21 | 135,096.10 | | | | |
| August 15 2021 | 26 | 1,560.44 | 265.69 | 1,294.75 | 133,801.35 | | | | |
| September 15 2021 | 27 | 1,560.44 | 263.14 | 1,297.30 | 132,504.05 | | | | |
| October 15 2021 | 28 | 1,560.44 | 260.59 | 1,299.85 | 131,204.20 | | | | |
| November 15 2021 | 29 | 1,560.44 | 258.03 | 1,302.41 | 129,901.80 | | | | |
| December 15 2021 | 30 | 1,560.44 | 255.47 | 1,304.97 | 128,596.83 | 2021 | 18,725.28 | 3,233.63 | 15,491.65 |

**AMORTIZATION SCHEDULE**
Payer - King Properties, Inc.
Payee - Trustee of the Erick Devine Revocable Trust dated August 16, 1995

| Date of Note | Principal Amount | Annual Percentage Rate | Monthly Interest Rate |
|---|---|---|---|
| June    17, 2019 | $ 160,651.76 | 2.36% | 2.75%/12 |

| | | | | | | Annual Totals | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | FYE | | 1099-INT |
| | | | | | | | Pmt $ | Interest | Principal |

| Payment Date | Pmt # | Pmt $ | Interest | Principal | Balance | FYE | Pmt $ | Interest | Principal |
|---|---|---|---|---|---|---|---|---|---|
| January  15  2022 | 31 | 1,560.44 | 252.91 | 1,307.53 | 127,289.30 | | | | |
| February  15  2022 | 32 | 1,560.44 | 250.34 | 1,310.10 | 125,979.19 | | | | |
| March  15  2022 | 33 | 1,560.44 | 247.76 | 1,312.68 | 124,666.51 | | | | |
| April  15  2022 | 34 | 1,560.44 | 245.18 | 1,315.26 | 123,351.25 | | | | |
| May  15  2022 | 35 | 1,560.44 | 242.59 | 1,317.85 | 122,033.40 | | | | |
| June  15  2022 | 36 | 1,560.44 | 240.00 | 1,320.44 | 120,712.96 | | | | |
| July  15  2022 | 37 | 1,560.44 | 237.40 | 1,323.04 | 119,389.92 | | | | |
| August  15  2022 | 38 | 1,560.44 | 234.80 | 1,325.64 | 118,064.28 | | | | |
| September  15  2022 | 39 | 1,560.44 | 232.19 | 1,328.25 | 116,736.03 | | | | |
| October  15  2022 | 40 | 1,560.44 | 229.58 | 1,330.86 | 115,405.17 | | | | |
| November  15  2022 | 41 | 1,560.44 | 226.96 | 1,333.48 | 114,071.70 | | | | |
| December  15  2022 | 42 | 1,560.44 | 224.34 | 1,336.10 | 112,735.60 | 2022 | 18,725.28 | 2,864.05 | 15,861.23 |
| January  15  2023 | 43 | 1,560.44 | 221.71 | 1,338.73 | 111,396.87 | | | | |
| February  15  2023 | 44 | 1,560.44 | 219.08 | 1,341.36 | 110,055.51 | | | | |
| March  15  2023 | 45 | 1,560.44 | 216.44 | 1,344.00 | 108,711.52 | | | | |
| April  15  2023 | 46 | 1,560.44 | 213.80 | 1,346.64 | 107,364.87 | | | | |
| May  15  2023 | 47 | 1,560.44 | 211.15 | 1,349.29 | 106,015.59 | | | | |
| June  15  2023 | 48 | 1,560.44 | 208.50 | 1,351.94 | 104,663.64 | | | | |
| July  15  2023 | 49 | 1,560.44 | 205.84 | 1,354.60 | 103,309.04 | | | | |
| August  15  2023 | 50 | 1,560.44 | 203.17 | 1,357.27 | 101,951.78 | | | | |
| September  15  2023 | 51 | 1,560.44 | 200.51 | 1,359.93 | 100,591.84 | | | | |
| October  15  2023 | 52 | 1,560.44 | 197.83 | 1,362.61 | 99,229.23 | | | | |
| November  15  2023 | 53 | 1,560.44 | 195.15 | 1,365.29 | 97,863.94 | | | | |
| December  15  2023 | 54 | 1,560.44 | 192.47 | 1,367.97 | 96,495.97 | 2023 | 18,725.28 | 2,485.65 | 16,239.63 |
| January  15  2024 | 55 | 1,560.44 | 189.78 | 1,370.66 | 95,125.30 | | | | |
| February  15  2024 | 56 | 1,560.44 | 187.08 | 1,373.36 | 93,751.94 | | | | |
| March  15  2024 | 57 | 1,560.44 | 184.38 | 1,376.06 | 92,375.88 | | | | |
| April  15  2024 | 58 | 1,560.44 | 181.67 | 1,378.77 | 90,997.12 | | | | |
| May  15  2024 | 59 | 1,560.44 | 178.96 | 1,381.48 | 89,615.64 | | | | |
| June  15  2024 | 60 | 1,560.44 | 176.24 | 1,384.20 | 88,231.44 | | | | |
| July  15  2024 | 61 | 1,560.44 | 173.52 | 1,386.92 | 86,844.52 | | | | |

## AMORTIZATION SCHEDULE
### Payer - King Properties, Inc.
### Payee - Trustee of the Erick Devine Revocable Trust dated August 16, 1995

| Date of Note | Principal Amount | Annual Percentage Rate | Monthly Interest Rate |
|---|---|---|---|
| June 17, 2019 | $ 166,651.76 | 2.36% | 2.75%/12 |

| Payment Date | Pmt # | Pmt $ | Interest | Principal | Balance | FYE | Pmt $ | 1099-INT Interest | Principal |
|---|---|---|---|---|---|---|---|---|---|
| August 15, 2024 | 62 | 1,560.44 | 170.79 | 1,389.65 | 85,454.88 | | | | |
| September 15, 2024 | 63 | 1,560.44 | 168.06 | 1,392.38 | 84,062.50 | | | | |
| October 15, 2024 | 64 | 1,560.44 | 165.32 | 1,395.12 | 82,667.38 | | | | |
| November 15, 2024 | 65 | 1,560.44 | 162.58 | 1,397.86 | 81,269.52 | | | | |
| December 15, 2024 | 66 | 1,560.44 | 159.83 | 1,400.61 | 79,868.91 | | | | |
| January 15, 2025 | 67 | 1,560.44 | 157.06 | 1,403.38 | 78,465.55 | 2024 | 18,725.28 | 2,098.22 | 16,627.06 |
| February 15, 2025 | 68 | 1,560.44 | 154.32 | 1,406.12 | 77,059.42 | | | | |
| March 15, 2025 | 69 | 1,560.44 | 151.55 | 1,408.89 | 75,650.53 | | | | |
| April 15, 2025 | 70 | 1,560.44 | 148.78 | 1,411.66 | 74,238.87 | | | | |
| May 15, 2025 | 71 | 1,560.44 | 146.00 | 1,414.44 | 72,824.43 | | | | |
| June 15, 2025 | 72 | 1,560.44 | 143.22 | 1,417.22 | 71,407.21 | | | | |
| July 15, 2025 | 73 | 1,560.44 | 140.43 | 1,420.01 | 69,987.21 | | | | |
| August 15, 2025 | 74 | 1,560.44 | 137.64 | 1,422.80 | 68,564.41 | | | | |
| September 15, 2025 | 75 | 1,560.44 | 134.84 | 1,425.60 | 67,138.81 | | | | |
| October 15, 2025 | 76 | 1,560.44 | 132.04 | 1,428.40 | 65,710.41 | | | | |
| November 15, 2025 | 77 | 1,560.44 | 129.23 | 1,431.21 | 64,279.20 | | | | |
| December 15, 2025 | 78 | 1,560.44 | 126.42 | 1,434.02 | 62,845.18 | | | | |
| January 15, 2026 | 79 | 1,560.44 | 123.60 | 1,436.84 | 61,408.34 | 2025 | 18,725.28 | 1,701.55 | 17,023.73 |
| February 15, 2026 | 80 | 1,560.44 | 120.77 | 1,439.67 | 59,968.67 | | | | |
| March 15, 2026 | 81 | 1,560.44 | 117.94 | 1,442.50 | 58,526.16 | | | | |
| April 15, 2026 | 82 | 1,560.44 | 115.10 | 1,445.34 | 57,080.82 | | | | |
| May 15, 2026 | 83 | 1,560.44 | 112.26 | 1,448.18 | 55,632.64 | | | | |
| June 15, 2026 | 84 | 1,560.44 | 109.41 | 1,451.03 | 54,181.61 | | | | |
| July 15, 2026 | 85 | 1,560.44 | 106.56 | 1,453.88 | 52,727.73 | | | | |
| August 15, 2026 | 86 | 1,560.44 | 103.70 | 1,456.74 | 51,270.99 | | | | |
| September 15, 2026 | 87 | 1,560.44 | 100.83 | 1,459.61 | 49,811.38 | | | | |
| October 15, 2026 | 88 | 1,560.44 | 97.96 | 1,462.48 | 48,348.91 | | | | |
| November 15, 2026 | 89 | 1,560.44 | 95.09 | 1,465.35 | 46,883.55 | | | | |
| December 15, 2026 | 90 | 1,560.44 | 92.20 | 1,468.24 | 45,415.32 | | | | |
| January 15, 2027 | 91 | 1,560.44 | 89.32 | 1,471.12 | 43,944.19 | 2026 | 18,725.28 | 1,295.42 | 17,429.86 |
| February 15, 2027 | 92 | 1,560.44 | 86.42 | 1,474.02 | 42,470.18 | | | | |

## AMORTIZATION SCHEDULE
Payer - King Properties, Inc.
Payee - Trustee of the Erick Devine Revocable Trust dated August 16, 1995

| Date of Note | Principal Amount | Annual Percentage Rate | Monthly Interest Rate |
|---|---|---|---|
| June 17, 2019 | $ 166,651.76 | 2.36% | 2.75%/12 |

| Payment Date | Pmt # | Pmt $ | Interest | Principal | Balance | | FYE | Pmt $ | 1099-INT Interest | Principal |
|---|---|---|---|---|---|---|---|---|---|---|
| March 15, 2027 | 93 | 1,560.44 | 83.52 | 1,476.92 | 40,993.26 | | | | | |
| April 15, 2027 | 94 | 1,560.44 | 80.62 | 1,479.82 | 39,513.44 | | | | | |
| May 15, 2027 | 95 | 1,560.44 | 77.71 | 1,482.73 | 38,030.71 | | | | | |
| June 15, 2027 | 96 | 1,560.44 | 74.79 | 1,485.65 | 36,545.06 | | | | | |
| July 15, 2027 | 97 | 1,560.44 | 71.87 | 1,488.57 | 35,056.50 | | | | | |
| August 15, 2027 | 98 | 1,560.44 | 68.94 | 1,491.50 | 33,565.00 | | | | | |
| September 15, 2027 | 99 | 1,560.44 | 66.01 | 1,494.43 | 32,070.57 | | | | | |
| October 15, 2027 | 100 | 1,560.44 | 63.07 | 1,497.37 | 30,573.20 | | | | | |
| November 15, 2027 | 101 | 1,560.44 | 60.13 | 1,500.31 | 29,072.89 | | | | | |
| December 15, 2027 | 102 | 1,560.44 | 57.18 | 1,503.26 | 27,569.63 | | 2027 | 18,725.28 | 879.59 | 17,845.69 |
| January 15, 2028 | 103 | 1,560.44 | 54.22 | 1,506.22 | 26,063.41 | | | | | |
| February 15, 2028 | 104 | 1,560.44 | 51.26 | 1,509.18 | 24,554.23 | | | | | |
| March 15, 2028 | 105 | 1,560.44 | 48.29 | 1,512.15 | 23,042.08 | | | | | |
| April 15, 2028 | 106 | 1,560.44 | 45.32 | 1,515.12 | 21,526.95 | | | | | |
| May 15, 2028 | 107 | 1,560.44 | 42.34 | 1,518.10 | 20,008.85 | | | | | |
| June 15, 2028 | 108 | 1,560.44 | 39.35 | 1,521.09 | 18,487.76 | | | | | |
| July 15, 2028 | 109 | 1,560.44 | 36.36 | 1,524.08 | 16,963.68 | | | | | |
| August 15, 2028 | 110 | 1,560.44 | 33.36 | 1,527.08 | 15,436.60 | | | | | |
| September 15, 2028 | 111 | 1,560.44 | 30.36 | 1,530.08 | 13,906.52 | | | | | |
| October 15, 2028 | 112 | 1,560.44 | 27.35 | 1,533.09 | 12,373.43 | | | | | |
| November 15, 2028 | 113 | 1,560.44 | 24.33 | 1,536.11 | 10,837.32 | | | | | |
| December 15, 2028 | 114 | 1,560.44 | 21.31 | 1,539.13 | 9,298.20 | | 2028 | 18,725.28 | 453.85 | 18,271.43 |
| January 15, 2029 | 115 | 1,560.44 | 18.29 | 1,542.15 | 7,756.04 | | | | | |
| February 15, 2029 | 116 | 1,560.44 | 15.25 | 1,545.19 | 6,210.86 | | | | | |
| March 15, 2029 | 117 | 1,560.44 | 12.21 | 1,548.23 | 4,662.63 | | | | | |
| April 15, 2029 | 118 | 1,560.44 | 9.17 | 1,551.27 | 3,111.36 | | | | | |
| May 15, 2029 | 119 | 1,560.44 | 6.12 | 1,554.32 | 1,557.04 | | | | | |
| June 15, 2029 | 120 | 1,560.10 | 3.06 | 1,557.04 | 0.00 | | 2029 | 9,362.30 | 64.11 | 9,298.19 |
| Total | | 187,252.46 | 20,600.70 | 166,651.76 | | | | 187,252.46 | 20,600.70 | 166,651.76 |

# EXHIBIT F

HEROLD LAW, P.A.
Craig S. Provorny, Attorney Id. No. 021601986
25 Independence Boulevard
Warren, New Jersey 07059
(908) 647-1022 (Tel.)
(908) 647-7721 (Fax)
cprovorny@heroldlaw.com
Attorneys for Petitioner

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION
BERGEN COUNTY
GENERAL EQUITY PART
DOCKET NO.

|  |  |
|---|---|
| In the Matter | : |
| of the Estate of Erick Devine | : |
| and the Erick Devine Revocable Trust | : |
|  | : |

Civil Action

**VERIFIED COMPLAINT**

Petitioner, Stifel Trust Company, N.A. in its capacities of Executor of the Estate of Erick Devine and Trustee of the Erick Devine Revocable Trust (the "Petitioner"), with its principal place of business at 501 N. Broadway, St. Louis, Missouri by way of Verified Complaint, says:

## STATEMENT OF FACTS

1.      Erick Devine (the "Decedent") established the Erick Devine Revocable Trust (the "Trust") on August 16, 1995, and most recently restated same on March 22, 2018. A true and correct copy of the Trust is attached hereto as Exhibit A.

2.      The Decedent died a resident of Woodcliff Lake Borough, New Jersey on April 18, 2019. A true and correct copy of the Decedent's Certificate of Death is attached hereto as Exhibit B.

3.      At the time of the Decedent's death, the Trust owned 333.33 shares of closely-held common stock in each of two corporations, King Properties, Inc. ("King") and Fisher Enterprises, Inc. ("Fisher").

4.      Pursuant to Paragraph 1 of the Stock Purchase Agreement for King, upon the death of a shareholder, King would have the right to purchase back the shares owned by the deceased shareholder. A copy of the Stock Purchase Agreement for King is attached hereto as Exhibit C.

5.      Similarly, pursuant to Paragraph 1 of the Stock Purchase Agreement for Fisher, upon the death of a shareholder, Fisher would have the right to purchase back the shares owned by the deceased shareholder. A copy of the Stock Purchase Agreement is attached hereto as Exhibit D.

6.      Both the Stock Purchase Agreement for King and the Stock Purchase Agreement for Fisher provided that the price of the companies' respective shares would be their fair market values on their valuation dates.

7.      Fair Market Value was defined in the Stock Purchase Agreements as "an amount which bears the same proportion to the Net Worth . . . of the Corporation as the number of Shares to be purchased to the total number of the Corporation's Shares outstanding on the Valuation Date."

8.      For the purposes of a purchase taking place upon to the death of a shareholder, the Valuation Date was defined in the Stock Purchase Agreements as "the last day of the month preceding the month in which the death of the deceased shareholder occurred."

9.      J. Dennis Devine ("Dennis"), acting on behalf of both King and Fisher, wishes to redeem all of the shares of King and Fisher owned by the Trust at the time of the Decedent's death.

10.    Dennis performed a valuation of the shares of King and Fisher owned by the Trust at the time of the Decedent's death as of March 31, 2019. *See the Certification of J. Dennis Devine.*

11.    Dennis's calculations determined that value of Fisher was negative.

12.    He determined, however, that if the total stockholder's equity was substituted for the valuation formula in the Fisher Stock Purchase Agreement, the Decedent's share of Fisher would equal $4,285.23.

13.    Dennis's calculations determined, based on the valuation formula in the King Stock Purchase Agreement, the Decedent's share of King would equal $208,314.70.

<u>COUNT I</u>

REQUESTING APPROVAL OF VALUATION AND
REDEMPTION OF SHARES

14.    Petitioner repeats the allegations contained in Paragraphs 1 through 13 of the Verified Complaint as if fully set forth herein.

15.    Though Petitioner has no objections to the valuations of King and Fisher conducted by Dennis, Petitioner has not performed a forensic examination of the books and records of either company and therefore submits said valuations to the court for approval.

16.    Petitioner has, however, reviewed the valuations of King and Fisher conducted by Dennis and is satisfied that they are fair and accurate.

17.    Accordingly, the valuations of King and Fisher conducted by Dennis should be approved.

18.    In addition, the redemptions of such shares of King and Fisher should be approved.

WHEREORE, Petitioner respectfully requests judgment:

A.    Approving the valuations of King and Fisher performed by Dennis;

- 3 -

B.      Approving the redemption of the shares of King and Fisher owned by the Trust at the time of the Decedent's death;

C.      Granting such further and other relief as this Court may deem just and equitable.

HEROLD LAW, P.A.
Attorneys for Petitioner


By:/s/ Craig S. Provorny
Craig S. Provorny, Esq.

DATED:  July 27, 2020

## DESIGNATION OF TRIAL COUNSEL

In accordance with R. 4:25-4, Craig S. Provorny, Esq. is hereby designated as trial counsel for the within matter.

HEROLD LAW, P.A.
Attorneys for Petitioner

By:/s/ Craig S. Provorny
Craig S. Provorny, Esq.

DATED:  July 27, 2020

## CERTIFICATION PURSUANT TO R. 4:5-1

The undersigned hereby certifies that the matter in controversy is not the subject of any other action pending in any court and is likewise not the subject of any pending arbitration proceeding.  The undersigned further certifies that he has no knowledge of any contemplated action or arbitration proceeding which is contemplated regarding the subject matter of this action.  The undersigned further certifies that he is not aware of any other parties who should be joined in this action.

HEROLD LAW, P.A.
Attorneys for Petitioner

By:/s/ Craig S. Provorny
Craig S. Provorny, Esq.

DATED:  July 27, 2020

- 5 -

<u>VERIFICATION</u>

I, Kurt Longworth, on behalf of Stifel Trust Company, N.A. in its capacities of Executor of the Estate of Erick Devine and Trustee of the Erick Devine Revocable Trust, verify that I have read the within Verified Complaint and verify that all facts contained therein are true to the best of my knowledge, information and belief and as to matters stated to be upon information and belief, have information to believe that same are true and accurate. Furthermore, I verify that the documents attached to the Verified Complaint as Exhibits are true and correct copies. I am aware if any of the foregoing statements made by me are willfully false I would be subject to punishment.

Stifel Trust Company, N.A.
Kurt Longworth, President

DATED: ___7·29·20___

- 6 -

# EXHIBIT G

HEROLD LAW, P.A.
Craig S. Provorny, Attorney Id. No. 021601986
25 Independence Boulevard
Warren, New Jersey 07059
(908) 647-1022 (Tel.)
(908) 647-7721 (Fax)
cprovorny@heroldlaw.com
Attorneys for Plaintiffs

|  | SUPERIOR COURT OF NEW JERSEY |
|---|---|
|  | CHANCERY DIVISION |
|  | BERGEN COUNTY |
|  | GENERAL EQUITY PART |
|  | DOCKET NO. C-152-20 |

STIFEL TRUST COMPANY, N.A.,
EXECUTOR OF THE ESTATE OF ERICK
DEVINE and STIFEL TRUST COMPANY,
N.A., TRUSTEE OF THE ERICK DEVINE
REVOCABLE TRUST, Plaintiffs

v.

THE ACTORS FUND OF AMERICA, THE
POINT FOUNDATION, WAYNE STATE
UNIVERSITY, THE SANDY FUND,
MICHAEL COLLINS, JEFFREY
DAVAULT, VERN STEFANIC, JAMES
YOUNG, JAMES WILLISTON, PATTY
METZ, WENDY LYNN WILLIAMS, and
SEAN ROSENZWEIG,
Defendants

Civil Action

ORDER

        This matter being opened to the Court by Herold Law, P.A., attorneys for Plaintiffs Stifel

Trust Company, N.A. in its capacity of Executor of the Estate of Erick Devine and Stifel Trust

Company, N.A. in its capacity of Trustee of the Erick Devine Revocable Trust (Craig S.

Provorny, Esq., appearing) by way of Order to Show Cause and Verified Complaint and such

Order to Show Cause and Verified Complaint having been unopposed and the Court having

reviewed the moving papers and good cause having been shown: *No opposition having

been filed see certification having proof of service by fax. No opposition

It is on this ___27___ day of _September_ 2020, ORDERED that:

1.    The valuations of Fisher Enterprises, Inc. and King Properties, Inc. as calculated

by J. Dennis Devine are hereby approved;

2.    The redemption of the closely-held common stock in Fisher Enterprises, Inc. and

King Properties, Inc. currently owned by the Erick Devine Revocable Trust is hereby approved.

A copy of this Order shall be served
upon all counsel/parties within
seven (7) days of the date hereof.

A RIDER IS ATTACHED HERETO
AND INCORPORATED HEREIN.    *

_____ Opposed

☒ Unopposed

JAMES J. DeLUCA, J.S.C.

*   Upon entry of this order the action is closed

- 2 -